IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

In re the Marriage of:

JODI LEE MEISTER, *Petitioner/Appellee,*

*v.*

LUCAS MEISTER, *Respondent/Appellant.*

No. 1 CA-CV 19-0618 FC
FILED 12-2-2021

Appeal from the Superior Court in Maricopa County
No.  FC 2017-070035
The Honorable Lisa Ann VandenBerg, Judge

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**

COUNSEL

Jennings Strouss & Salmon PLC, Phoenix
By Maxwell Mahoney, Norma C. Izzo
*Counsel for Respondent/Appellant*

Dickinson Wright PLLC, Phoenix
By Leonce A. Richard, III
*Counsel for Petitioner/Appellee*

## OPINION

Presiding Judge Michael J. Brown delivered the opinion of the Court, in which Judge D. Steven Williams and Judge Peter B. Swann joined.

**B R O W N**, Judge:

¶1        Lucas Meister ("Husband") appeals the superior court's decree of dissolution ending his marriage to Jodi Meister ("Wife"), arguing the court erred in valuing Precision Blasting Services ("PBS"), a business the couple owned jointly.  We conclude the court erred in failing to account for significant changes in PBS that occurred shortly after the divorce proceedings began.  And because we cannot discern whether the court's chosen valuation date and its ultimate division of assets were fair and equitable, we vacate the portion of the decree valuing PBS, as well as the related division of assets between the parties, and remand for further proceedings.  We otherwise affirm the decree.

## BACKGROUND

¶2        Husband and Wife married in 2002.  In 2007, Wife and her brother ("Brother") formed PBS, but they agreed Husband would manage the company.  The following year, Husband also began working as a salaried employee for Arizona Drilling and Blasting ("ADB"), a subsidiary of Fisher Industries, and co-owned by Thomas Fisher ("Fisher").  Husband managed ADB's drill and blasting division.  In 2010, ADB and PBS entered a contract ("Blasting Contract"), under which ADB would bid on blasting projects and direct them to PBS; invoices submitted to ADB would be based on "cost plus markup."

¶3        In 2015, Husband and Wife purchased Brother's 49% interest in PBS for $795,000,[1] and it is undisputed that PBS is community property.  Husband continued as PBS's general manager, where he ran the day-to-day business operations, in addition to his continued work as an employee of

---

[1]        In November 2017, Brother sued Husband and Wife, claiming they breached the stock purchase agreement.  The lawsuit was eventually resolved, with Husband and Wife agreeing to pay Brother $420,000, secured by two deeds of trust.

ADB. Wife managed PBS's accounts receivables, payables, insurance, benefits, and regulatory compliance.

¶4 Husband and Wife separated in August 2016. Husband incurred substantial business and personal expenses after their separation and throughout the subsequent divorce proceedings. After mediation efforts failed, Wife petitioned for dissolution and Husband accepted service on January 31, 2017. In considering their community property, the parties contemplated that Husband eventually would buy Wife's interest in PBS. As Wife later testified, she was unable to perform her duties at the company after the divorce proceedings began because Husband harassed her and "excluded" her from the company. In June 2017, Husband fired Wife from PBS and she was no longer involved with the business.

¶5 Meanwhile, in late 2016 or early 2017, ADB and PBS were working on a project in Nevada. The owner of that project contacted Fisher and informed him that PBS was overbilling for blasting work. In early 2017, Fisher began an internal investigation and found PBS was marking up its charges between 30% and 40%. The Blasting Contract did not specify what markup ADB would pay for PBS's services, but Fisher was under the impression that he and Husband had discussed a 5% to 8% markup when they entered the agreement. As Fisher continued to investigate, he found that Husband had charged ADB a markup of between 30% and 40% on other projects.[2] On April 27, 2017, Fisher fired Husband from ADB and terminated the Blasting Contract with PBS, asserting Husband (1) had a conflict of interest with PBS; (2) had breached his duty of loyalty/code of ethics as an employee of ADB; and (3) had overbilled invoices submitted to ADB.[3] Termination of the Blasting Contract was a financial blow to PBS because ADB was its biggest customer, by far. In addition, ADB owed PBS $980,000 (the "Receivable") but refused to pay it, which created additional financial issues for PBS.

¶6 With no business from ADB, PBS's gross revenues and net income dropped dramatically over the remainder of 2017 and declined

---

[2] PBS's annual gross revenues from 2013 to 2015 averaged almost $6,000,000, generating an average net income of about $300,000. In 2016, gross revenue rose to more than $9,000,000, with a net income of $1,085,038.

[3] Nothing in the record before us reveals any judicial determination that Husband breached the Blasting Contract, or that he engaged in tortious, fraudulent, or otherwise criminal conduct in connection with the overbilling issue.

further in 2018. Starting in the summer of 2017, Husband sold some company equipment so PBS could continue to operate even though doing so violated the superior court's temporary orders, which barred the sale of any company assets without Wife's consent. The sales netted around $1.4 million. In November, Wife sought a contempt order, asserting she did not know what Husband was doing with the proceeds and he was improperly using PBS's funds for his personal use.

¶7        Husband and Wife each hired experts to offer opinions as to PBS's value. Wife hired Lynton Kotzin, whose valuation had formed the basis for the parties' purchase of Brother's interest in PBS in 2015. Kotzin opined that the proper valuation date was March 31, 2017 because that was an end-of-quarter-date close to the date of service. According to Kotzin, on that date PBS was worth $2,646,000. He relied primarily on the "single-period capitalization method" for his valuation because he anticipated that PBS's future performance "will not differ significantly from historical financial results." Kotzin acknowledged that PBS lost ADB as a customer within a month after March 31, that ADB had been the source of roughly 90% of PBS's revenue, and that PBS would not collect the Receivable. But Kotzin opined it was inappropriate to consider those facts in valuing the company because they were neither "known [n]or knowable" on March 31, 2017.

¶8        Husband hired Mark Hughes, who opined that PBS should be valued as of December 31, 2017, when the full consequences of PBS's falling out with ADB had become apparent. Hughes valued PBS's fair market value at $1,120,000. Hughes also challenged Kotzin's valuation on four grounds, summarized as follows: (1) termination of the Blasting Contract was known or knowable as of March 31, 2017 because Fisher was investigating PBS's billing practices; (2) Kotzin erred by relying on a 31.9% gross profit margin projection (with $9.2 million revenue) in perpetuity; (3) Kotzin did not account for increased risk based on Fisher having obtained its own blasting permit in 2015; and (4) Kotzin should not have included the Receivable in projected revenues, given that PBS had written it off on its 2017 tax return.

¶9        According to Hughes, the $420,000 payment the parties owed to Brother in settlement of an unrelated litigation, *supra* ¶ 3 n.1, demonstrated the reasonableness of the December 31, 2017 valuation. And in a later valuation, Hughes believed that due to further declining revenues, PBS's fair market value at the end of 2018 was $120,000.

¶10 At the March 2019 trial, the superior court admitted numerous exhibits and heard testimony from Wife, Husband, and their experts. In the resulting decree, the court found in part that given "the lack of known or knowable changes" occurring before Husband's termination from ADB, and PBS's loss of the Blasting Contract, it would be inequitable to use Hughes's valuations, particularly the 2018 valuation, given the time between date of service and Husband's "actions/control of PBS thereafter." The court therefore found that Kotzin's valuation provided the most relevant picture of PBS at the time of service of Wife's petition. The court also concluded Wife made a prima facie showing to support her waste claim, which Husband failed to rebut, and that the waste claim was "granted and embedded in the distribution of property."

¶11 In dividing the principal assets and liabilities, the court awarded PBS to Husband at a value of $2,646,000 and ordered him to pay the $420,000 note to Brother. The court awarded Wife another community-owned company, MEI-D, which owns the real property and the building where PBS currently operates, with a net value of $590,000. The court divided the proceeds of the sale of the marital residence, $341,909.90, equally between Husband and Wife but awarded them to Wife as a partial offset against the value of PBS. The court then ordered Husband to pay Wife an equalization payment of $647,000 and ruled that Wife's contempt claim was moot. Husband timely appealed.

## DISCUSSION

¶12 Husband argues the superior court abused its discretion because the record does not support its choice of a valuation date and the date the court selected results in an unfair division of property. We review a court's decision on the value of a business in a divorce proceeding for an abuse of discretion. *Schickner v. Schickner*, 237 Ariz. 194, 197, ¶ 13 (App. 2015). A court abuses its discretion when it rules without competent evidence or commits a legal error in making a discretionary decision. *Engstrom v. McCarthy*, 243 Ariz. 469, 471, ¶ 4 (App. 2018).

¶13 Community property must be divided "equitably, though not necessarily in kind, without regard to marital misconduct." A.R.S. § 25-318(A). The superior court is not "bound by any per se rule of equality," but rather has "discretion to decide what is equitable in each case." *Toth v. Toth*, 190 Ariz. 218, 221 (1997). While community property generally implies equal ownership between both spouses, and an equal distribution may often be the most equitable, "there may be sound reason to divide the property otherwise." *Id.* For example, the court may consider "excessive

or abnormal expenditures" to reach an "equitable division of community property." *Martin v. Martin*, 156 Ariz. 440, 447 (App. 1986) (citing § 25-318(C)).

**¶14**       The superior court has wide discretion in apportioning community property under § 25-318. *In re Marriage of Berger*, 140 Ariz. 156, 168 (App. 1983). The court's discretion includes the ability to choose a valuation date for community assets, such as a shared business. *See Sample v. Sample*, 152 Ariz. 239, 242 (App. 1986). In *Sample*, this court recognized that the equitableness of property distribution is "the very touchstone of a proper apportionment," and as such, the "trial court must be allowed to utilize alternative valuation dates." *Id.* To resolve the appeal before us, we must assess whether the superior court's choice of a valuation date reached an equitable result that "stand[s] the test of fairness on review." *Id.* (quotation and citation omitted). We construe all reasonable inferences in favor of sustaining the court's decision. *Berger*, 140 Ariz. at 168.

### A.       Selecting a Valuation Date

**¶15**       The superior court adopted Kotzin's proposed valuation date, in part, because it was closest in time to the date Husband accepted service of the petition for dissolution. Neither party has cited, nor have we found, any Arizona authority mandating or even suggesting a community asset must be valued at or near the date of service. The absence of a specific standard, or even a presumption, in Arizona is consistent with many other jurisdictions that grant courts broad discretion to determine a valuation date. *See, e.g.*, *Thomas v. Thomas*, 580 S.E.2d 503, 506 (Va. Ct. App. 2003) ("[I]n the interests of just and fair results, the trial court should choose the valuation date which is most likely to provide the most current and accurate information available . . . ."); *Tummings v. Francois*, 82 So. 3d 955, 960 (Fla. Dist. Ct. App. 2011) (noting that a valuation date for community property is determined by what is "just and equitable under the circumstances").

**¶16**       Some jurisdictions, however, follow the rule that property should be valued as of the date of the property division hearing or trial. *See, e.g.*, *Miller v. Miller*, 105 P.3d 1136, 1143 (Alaska 2005); *Morgan v. Morgan*, 854 P.2d 559, 563 (Utah Ct. App. 1993). Nonetheless, even in those jurisdictions, a court may use an alternate date as long as it makes specific findings on the record explaining why that date is more likely to reach an equitable result. *See, e.g.*, *Ogard v. Ogard*, 808 P.2d 815, 820 (Alaska 1991) (noting that if the court chooses a different date than the date of trial, it should make "specific findings" to support that date); *Morgan*, 854 P.2d at

563 ("[T]he trial court's findings must be sufficiently detailed to explain its basis for deviating from the general rule.").

¶17 Notwithstanding these different approaches to selecting a date of valuation, we see no reason to disturb the general principles recognized in *Sample* that (1) the court's choice of a valuation date should generally be dictated by pragmatic considerations, and (2) the decision must comport with principles of fairness and equity. *See Sample*, 152 Ariz. at 242–43 (rejecting the argument that "precedent compels the adoption of a valuation at dissolution formula"); *see also* § 25-318(A). Generally speaking, the term "equitable" sufficiently encompasses the notions of fairness and equity as described in *Sample*, because "'[e]quitable' means just that—it is a concept of fairness dependent upon the facts of particular cases." *Toth*, 190 Ariz. at 221. Achieving an equitable distribution of the marital assets is also the touchstone of § 25-318(A).

¶18 Simply stated, in a dissolution proceeding the superior court has wide discretion to choose a business's valuation date, so long as the ultimate valuation is equitable. *See Sample*, 152 Ariz. at 242–43. The court certainly may use the date of service, or a date near the date of service, as a starting point in choosing the valuation date. *See id.* at 242 ("Indeed, it would contravene the very purpose of A.R.S. § 25-318(A) for this court to develop a general valuation rule . . . ."). But the court must select a different date when necessary to ensure an equitable result.

¶19 Here, PBS lost the Blasting Contract and the Receivable less than four weeks after the March 31, 2017 valuation date, and almost two years before trial. Notwithstanding these significant events, the superior court found the March 31, 2017 date offered the "most relevant picture of the PBS business at the time of termination of the community" because it was close to the date of service and accurately reflected the parties' joint participation in the business at the time. Further, the court also reasoned that Wife was not responsible for the loss of the Blasting Contract and was not involved in the business thereafter. But PBS losing the Blasting Contract and the Receivable is attributable to Husband's conduct *before* the date of service; specifically, he was fired by ADB, the Blasting Contract was terminated, and he was notified the Receivable would not be paid due to alleged overbilling practices that occurred *during* the marriage. Also, even if Husband was solely responsible for the loss of the Blasting Contract, Wife was working for PBS when the alleged overbilling occurred, and the community received the fruits of Husband's overbilling when ADB paid PBS's increased markups. As explained more fully below, we conclude the

court erred in failing to properly factor these events into its valuation of PBS.

### B.    Foreseeability

¶20    Husband argues the superior court's valuation date and division of property does not satisfy *Sample's* fairness test because the court effectively ignored PBS's loss of income from ADB after March 31, 2017. He asserts the valuation date is unfair because he was awarded PBS—an entity that lost 95% of its revenue from the termination of the Blasting Agreement, due to Husband's alleged overbilling—and must now pay Wife the value of the asset as if it still had the same level of revenue.

¶21    In her answering brief, Wife does not address (1) the substantial change in PBS's financial picture that occurred just weeks after the March 31, 2017 valuation date when ADB terminated the Blasting Contract; (2) the Receivable that PBS could no longer collect; or (3) whether the valuation date was unfair because it was based on the much higher levels of revenue PBS generated when it was charging a 30–40% markup on its projects. Instead, Wife contends the superior court had sufficient evidence to determine that the loss of the Blasting Contract and the Receivable were not known or knowable (foreseeable) as of March 31, 2017.

¶22    As Husband contends, while the superior court recognized that termination of the Blasting Agreement and the Receivable "dramatically impacted the future revenue stream of PBS," the court did not account for these significant events when it chose a valuation date. Instead, the court concluded it would be "inequitable" to use Hughes's valuation date because the loss of the Blasting Contract and the Receivable were not "reasonably foreseeable." But the court failed to explain, and the record does not reveal, how the lack of foreseeability about losing the Blasting Contract and Receivable justified valuing the company as of that date.

¶23    We express no opinion on whether the valuation of a business for any other purpose should turn on whether a specific event is foreseeable as of the date of valuation. But when a court is valuing a community asset in a *dissolution* proceeding it triggers different considerations, and otherwise "standard" valuation approaches must yield to the overarching principles of equity. Here, although both experts seemed to agree that foreseeability was a necessary consideration, neither party has cited, nor has our research revealed, any authority suggesting that foreseeability should have controlled the court's choice of a valuation date. While

foreseeability may be a relevant factor in some cases, it cannot trump the question of whether the selection of the valuation date must produce an equitable result. In the absence of any finding about the equitableness of the March 31 date here, and the lack of specific evidence supporting such a finding, the court abused its discretion to the extent it selected the valuation date based on Kotzin's opinion that termination of the Blasting Contract and nonpayment of the Receivable were not foreseeable.

¶24 The superior court appears to have concluded that Husband's management decisions after he took control of the business meant that he should bear all responsibility for any events affecting PBS that occurred after the valuation date. But we cannot see how the court's finding that the loss of the Blasting Contract and Receivable were not foreseeable justifies that conclusion. The court found that the events occurring after March 31, 2017, were "the product of Husband's personal mismanagement/poor decisions," explaining that he unilaterally took large cash distributions, increased his salary, closed bank accounts, canceled Wife's company credit card, blocked her access to financial accounts, and sold $1.4 million in company equipment without Wife's consent and in violation of court orders. The court then selected Kotzin's proposed valuation date, apparently to compensate Wife for the financial consequences of Husband's conduct after loss of the Blasting Contract and Receivable. Husband's business decisions, management, and excessive spending after these events may have a direct correlation to the decline in value of PBS, particularly in light of the court's finding that he was not credible in describing his efforts to maintain PBS as a going concern. But neither the record nor the court's ruling show how Husband's poor management or wasteful spending impacted the value of PBS to such an extent that it was appropriate to disregard PBS's losses of 95% of its business and almost $1 million in accounts receivable.

### C. Waste

¶25 Husband also argues the superior court erred in selecting a valuation date based on waste, which the court and Wife seem to define as his business misconduct relating to the overbilling of ADB. Husband contends he rebutted Wife's prima facie claim for waste and the community should be liable for the losses associated with the termination of the Blasting Contract because the community benefitted from the alleged overbilling that gave rise to the termination. Wife does not address the waste claim on its own but contends the valuation date is fair under *Sample* because Husband engaged in misconduct, which she describes as "contemptible conduct and pillaging of the parties' business." According

to Wife, the court's waste findings were based not on overbilling but solely on Husband's misconduct after the valuation date; specifically, his violation of court orders when he had exclusive control of PBS.

**¶26**      The determination of waste, also referred to as dissipation, is governed by § 25-318(C), which permits the court to consider "excessive or abnormal expenditures, destruction, concealment or fraudulent disposition of community, joint tenancy and other property held in common." *See also Martin v. Martin*, 156 Ariz. 452, 458 (1988). The spouse alleging abnormal or excessive expenditures has the burden of making a prima facie showing of waste. *Gutierrez v. Gutierrez*, 193 Ariz. 343, 346, ¶ 7 (App. 1998). When a spouse makes that showing, the burden shifts to the spending spouse to rebut the showing of waste "because all of the evidence relative to the expenditures is generally within the knowledge, possession, and control of the spending spouse." *Id.* at 346–47, ¶ 7.

**¶27**      If a court finds a party committed waste that reduced the value of a community business, it may consider such waste in selecting a valuation date for the business. *See, e.g.*, *Fuchs v. Fuchs*, 276 A.D.2d 868, 869–70 (N.Y. App. Div. 2000) (affirming the court's earlier valuation date "based on its determination that a wasteful dissipation of marital assets had occurred"); *Wright v. Wright*, 737 S.E.2d 519, 534 (Va. Ct. App. 2013) ("[A]n alternate valuation date may be necessary due to the dissipation of marital assets by one of the spouses after the separation of the parties."). On the other hand, if a court finds that waste did not affect the value of the business but did impact other marital assets, the court "may, when apportioning the community property, award money or property sufficient to compensate the other spouse for that waste." *Hrudka v. Hrudka,* 186 Ariz. 84, 93 (App. 1995), *superseded in part by statute on other grounds*; *see also Helland v. Helland*, 236 Ariz. 197, 201, ¶ 17 (App. 2014) ("When the court determines one spouse has wasted or dissipated marital assets, it may apportion the community property in a manner designed to compensate the other spouse for the waste.").

**¶28**      Here, the superior court's analysis relating to waste, or misconduct, cannot be sustained because we are unable to determine how its waste finding affected the chosen valuation date, the resulting value of PBS, or the ultimate property distribution. Contrary to Wife's assertions, the court's general finding—that Husband's waste is "embedded" into in the overall "distribution of property"—provides no reasonable basis for us to determine whether the court's valuation of PBS was equitable.

¶29        The superior court seems to have agreed with the position Wife takes on appeal, finding that Husband committed waste "with respect to PBS" and that PBS's financial losses after March 31 occurred because of Husband's personal mismanagement and poor decisions. For example, the court appeared to base its "waste" finding, at least in part, on the following: Husband sold PBS equipment in defiance of the court's orders and without Wife's consent; he paid himself $16,666 as his monthly salary ($200,000 a year); and, using PBS credit cards, he spent tens of thousands of dollars on personal items with business funds. The court also referenced Husband's expenditures of approximately $13,000 a month for his $3 million home, but the court did not address whether any community funds were spent in acquiring the home, account for the substantial mortgage owed on the home, or otherwise explain how Husband's monthly expenses factored into its waste finding. Further, the July 2017 temporary orders set Husband's annual salary from PBS at $200,000, as reflected in the joint pretrial statement. At the very least, the court abused its discretion to the extent it concluded Husband's salary was wasteful.

## D. Equitableness Review

¶30        The decree the superior court entered lacks sufficient analysis to permit us to decide whether its valuation of PBS and its ultimate division of assets were equitable under *Sample* and § 25-318(A). Absent a proper request from a party that triggers mandatory "separate findings of fact and conclusions of law," no bright-line rule exists as to what a court must include in addressing whether a selected valuation date is equitable. *See* Ariz. R. Fam. Law P. 82(a)(1). That being said, if *Sample* is to have any meaning, the court must provide enough analysis, however labeled, to allow an appellate court to fulfill its obligation to decide whether the valuation date, and resulting property distribution, withstand the test of equity and fairness. *See Sample*, 152 Ariz. at 242–43 (holding that § 25-318(A) "provides that the selection of a valuation date rests within the wide discretion of the trial court and will be tested on review by the fairness of the result"). When the court's ruling lacks such analysis, we cannot merely presume that the valuation complies with *Sample* and § 25-318(A).[4]

---

[4]        Specific analysis addressing the test of equitableness may not always be required. For example, if reasonable evidence is readily apparent from the record that the selected date of valuation and resulting value are

¶31      On remand, the superior court should address, in addition to any other relevant matters: (1) how the loss of the Blasting Contract and the Receivable affected the value of PBS; (2) selection of a valuation date that is supported by sufficient evidence and analysis to allow meaningful appellate review; (3) the value of PBS as of the valuation date; (4) the amount Wife was harmed by Husband's wasteful business practices after service of the petition in terms of causing a decrease in the value of PBS; (5) the amount Wife was harmed by Husband's wasteful spending of other community funds; (6) calculation of appropriate offsets, if any; and (7) how the ultimate property distribution is equitable.

## CONCLUSION

¶32      We vacate the court's valuation of PBS and remand for clarification and additional analysis consistent with this opinion.  The court may permit the parties to present additional evidence appropriate to achieve an equitable division.  We affirm the rest of the decree except as the superior court may find necessary to modify the property division to account for changes in the value of PBS.  In our discretion, we deny both parties' requests for attorneys' fees and costs under A.R.S. § 25-324(A).



AMY M. WOOD • Clerk of the Court
FILED:    AA

---

equitable, then an appellate court presumably can still meet its obligation under *Sample*.