627 P.2d 708

Gertrude J. POTTHOFF,
Petitioner-Appellee,

v.

Herbert B. POTTHOFF,
Respondent-Appellant.

No. 1 CA–CIV 5291.

Court of Appeals of Arizona,
Division 1,
Department B.

Jan. 29, 1981.

Rehearing Denied March 13, 1981.

Review Denied April 7, 1981.

Warner, Angle, Roper & Hallam by Jerry L. Angle, Roger K. Gilbert, Phoenix, for petitioner-appellee.

Lewis & Roca by Jeremy E. Butler, Paul G. Ulrich, Phoenix, for respondent-appellant.

## OPINION

JACOBSON, Judge.

The sole issue in this appeal is whether the trial court correctly determined that property acquired by the husband prior to marriage could be distributed upon dissolution of the marriage as community property.

This action was instituted by appellee, Gertrude J. Potthoff, (wife) by filing a petition for dissolution of her marriage to appellant, Dr. Herbert B. Potthoff (husband). Following an extended trial, the trial court entered a minute entry dissolving the marriage and declared the parties' respective interests in various properties owned by them, including a determination that two parcels of real property identified as the Palm Grove property and the Hyder property were community property subject to division in the dissolution proceedings. In November of 1978, this minute entry was reduced to a judgment which ordered the two parcels to be sold.

Subsequently, on December 24, 1978, an amended decree of dissolution was entered which incorporated a settlement agreement between the parties. The agreement settled all issues between them except those concerning the Palm Grove and the Hyder properties. The husband has appealed.

The parties were married on December 28, 1962, in Phoenix, Arizona. At that time the husband was an established practicing physician in Phoenix, Arizona. Prior to his marriage to his wife, the husband had been married to Norma Potthoff, and as part of their dissolution, the husband had agreed to pay Norma $15,000 "in full payment for any and all community interest which she shall have had . . . ." The payment to Norma consisted of a lump sum payment of $1,000 and monthly payments in the sum of $315 each. At the time of his marriage to the wife, the husband had paid to Norma under this arrangement the sum of $7,300. The balance of $7,700 was paid after the marriage.

In 1959, and prior to the marriage, the husband acquired an undivided one-half interest in a section of land near Hyder, Arizona (referred to as the Hyder property). On October 12, 1962 (approximately two months prior to his marriage to wife) the husband acquired the other one-half interest in this land. The purchase price for the 1962 acquisition was subsequently paid, after marriage. Both of the deeds gave the husband title as "his sole and separate prop-

erty." In 1973, the husband conveyed one-half of this section to a third party under a sales agreement which stated: "This agreement entered into between Herbert B. Potthoff, husband of Gertrude J. Potthoff, dealing with his sole and separate property . . . ." This property, at time of trial, was unimproved, raw desert land.

Also prior to the marriage of the parties, the husband on May 8, 1955, acquired an undivided one-half interest in unimproved land at the N.E. corner of 40th Street and East Indian School Road (referred to as the Palm Grove property). On August 18, 1960, the husband acquired the other one-half interest from his partner, Daniel Roe, who retained an encumbrance on the property for the balance owed Roe under the purchase.

After the marriage, the husband sold a corner of the Palm Grove property to Humble Oil Company for $85,000. According to the escrow closing statement for that sale, $34,840 of the sale proceeds were paid to Roe to release his encumbrance.

At this point, it is necessary to explain how the parties managed their financial affairs. From the date of their marriage until November, 1965, they maintained one bank account (with the exception of the wife's household account) referred to at trial as the "M.D." account. The husband was the only signator on this account. Into this one account were deposited all funds of the husband's medical practice, loan proceeds, proceeds from the sale of various properties and shares of stock dividend and interest income and the proceeds of the sale of the wife's separate property. Also from this account were paid out all the expenses of the medical practice, the living expenses of the parties, costs of subsequent investments, and expenditures relating to the two parcels of real property involved here. The trial court found that by reason of the various transactions concerning this account and because of the loss of certain records affecting this account, the funds therein had become so commingled that the identity of separate funds therein was lost and thus the entire account would be considered to be community property.

Insofar as the M.D. account is pertinent to the issues on appeal, the evidence shows that both before the marriage and thereafter, the husband intended to develop the Palm Grove property as a shopping center. As previously indicated, approximately a year after the marriage, the husband sold a corner of this property to Humble Oil and, after paying off the encumbrance, deposited the balance of approximately $49,500 in the M.D. account.

Approximately a year after the sale to Humble Oil, the husband obtained a commitment for $550,000 from O'Malley-Pickrell Mortgage Company for interim financing of the construction of a shopping center on the Palm Grove property. At the insistence of the lendor, both the wife and the husband signed the promissory note to O'Malley-Pickrell for $550,000. Following construction and upon a commitment from Lucky Stores, Inc. and Super-X Drugs that they would be tenants of the shopping center, permanent financing was obtained from American National Life Insurance Company. The note and mortgage for the permanent financing were signed solely by the husband and showed a lien on his "sole and separate property." It appears that the rentals from Lucky and Super-X are sufficient to carry the permanent financing obligation.

The actual cost of the construction of the shopping center was approximately $515,000. A portion of the interim loan proceeds in the amount of $50,000 was deposited in the M.D. account. On the same day as this deposit was made, the husband paid $25,732 out of this account toward the purchase price of the Hyder property. In addition, checks totalling $17,501 were drawn on the M.D. account toward the purchase of the Hyder property.

Following the construction of the shopping center, another account entitled "Palm Grove-Potthoff Properties Account" was established, into which rentals from the shopping center were deposited and expenses in connection with the center were withdrawn. The wife maintained that during the mar-

riage, $92,707 of community funds were deposited into this account. This sum consisted of $25,807 transferred from the M.D. account to the Palm Grove account; $55,900 in loan proceeds obtained by both parties from the Arizona Bank; and $11,000 from loans on the cash surrender value of two life insurance policies on the husband's life. Although the life insurance policies were acquired prior to marriage, the wife maintained that the premiums thereon were paid by community funds.

The wife also presented evidence that both during and following construction of the shopping center, the husband devoted considerable time and effort in managing, leasing and supervising the shopping center.

Finally, the evidence shows that during the tax years of 1967–68, the parties filed separate income tax returns listing the Palm Grove property as community property. These returns were audited by the Internal Revenue Service and approved.

The questions presented on appeal are highlighted by two findings and conclusions of the trial court:

(1) As to the Hyder property, the court concluded that this acreage "has become so commingled with community property funds as to make any separate characteristics thereof indistinguishable and the court finds that said property is the community property of the parties."

(2) As to the Palm Grove property, the court concluded: "The Palm Grove Shopping Center . . . was developed and constructed during the marriage through the use of community property funds including the use of funds obtained from loans based upon community property credit. The change of this asset from bare land to shopping center was so substantial and complete as to cause transformation of this asset from separate property of the Respondent to community property of the parties."

Before discussing the separate legal consequences as to each of these properties it is important to identify legal concepts applicable to both. The concept of community property law in Arizona is built upon two pillars: that property acquired during the marriage is community property (A.R.S. § 25–211) and that property acquired prior to marriage is separate property (A.R.S. § 25–213). These two property rights are of equal importance. As stated in *Porter v. Porter*, 67 Ariz. 273, 282, 195 P.2d 132, 137 (1948):

[T]he rights of married persons in their separate property are as impregnable and as thoroughly fixed as their right in their community property.

Another basic tenet of community property law is that property acquires its character as community or separate depending upon the marriage status of its owner at the time of acquisition. *Lawson v. Ridgeway*, 72 Ariz. 253, 233 P.2d 459 (1951). "Time of acquisition" refers to the time at which the right to obtain title occurs, not to the time when legal title actually is conveyed. *Hollingsworth v. Hicks*, 57 N.M. 336, 258 P.2d 724 (1953).

As was stated in *Flynn v. Allender*, 75 Ariz. 322, 325, 256 P.2d 560, 562 (1953), quoting from 41 C.J.S. Husband and Wife § 483, p. 1023:

After property purchased on credit or with borrowed funds has acquired the status of separate property of one of the spouses at the time of purchase, its status remains such regardless of the nature of the funds which thereafter satisfy the obligation, whether community funds or separate funds of the other spouse.

Therefore, once that status as community or separate becomes fixed, it retains that character until changed by agreement of the parties or by operation of law. *Horton v. Horton*, 35 Ariz. 378, 278 P. 370 (1929).

Applying these basic principles to the two properties involved here, we hold that since the husband acquired the right to obtain title to both of these properties prior to his marriage to his wife, at the time of their marriage these properties were the separate properties of the husband. Whether their status as separate properties of the husband remained throughout the marriage or was changed by an agreement

of the parties or by operation of law shall be discussed under the facts applicable to the individual properties involved.

## HYDER PROPERTY

The trial court apparently utilized two theories to transform the Hyder property, which we have deemed to be separate property of the husband at the time of marriage, into community property of the parties: (1) a "commingling" theory, and (2) a theory based upon the proposition that the use of community funds to pay the husband's ex-wife, Norma, for her interest in the property converted the property to a community property status.

The commingling theory as urged by the wife is this: After the marriage, the husband used funds from the M.D. account which the trial court found to be community funds to complete the purchase of an undivided one-half interest in the Hyder property; that thereafter one-half of the Hyder property was sold and at the time of trial, the husband was unable to show which interest in the property remained— that purchased with separate funds or that purchased with community funds; and that therefore it is presumed that the interest that remains is community property.

This argument, however, flies directly in the face of the proposition of community property law which has previously been expressed, that is, that if separate property is subsequently paid for by community funds, it does not thereby lose its character as separate property.

 Moreover, transmutation of separate to community property by operation of law does not occur simply because of commingling. Rather, the commingling must be such that the identity of the property as separate or community is lost. This is made clear by *Porter v. Porter, supra,* 67 Ariz. at 283, 195 P.2d at 138:

Mere mutations of form do not of themselves work a transmutation of the character of property, as being community or separate, after once it has been cast either into the community, or to the separate estate of the husband or the wife; and the same is true of the commingling of separate and community property, the separate property remaining separate *as long as it can be identified.* It is where, by such process, the identity of separate property is lost that, by the operation of *the presumption in favor of the community,* a transmutation takes place. (Emphasis added.)

Thus, where property of identical character, such as money, is so mixed together that a court is unable to tell how much money was originally separate and how much was originally community, a transmutation of separate money into community money occurs. *Evans v. Evans,* 79 Ariz. 284, 288 P.2d 775 (1955). This concept is simply not applicable to real property because of the "unique" nature of that type of property. You cannot mix Black Acre with White Acre and obtain Gray Acre. We therefore hold that a "commingling" theory will not support the trial court's finding that the Hyder property was community property.

 We likewise reject the theory that the use of community funds to pay an ex-wife for her interest in the property caused it to become community property of the new community. If in fact the ex-wife Norma had an interest in this property (which is not clear from the record) which the husband was purchasing, that obligation would have been the separate obligation of the husband. If the husband satisfied that separate obligation with community funds, then, at most, the community might acquire a claim for reimbursement for such payment in the nature of an equitable lien on the property. *Lawson v. Ridgeway, supra; Tester v. Tester,* 123 Ariz. 41, 597 P.2d 194 (App.1979). The same equitable lien might also apply to any payments made by the community on the purchase price of the property. However, the right of the community to be reimbursed for the amount of the lien does not change the character of the property from separate to community. *Kingsbery v. Kingsbery,* 93 Ariz. 217, 379 P.2d 893 (1963).

We do not mean to intimate here that the payment of the obligation due the ex-wife Norma automatically gave rise to a community lien on the Hyder property. We discuss the nature of this payment later in this opinion.

We therefore hold that the judgment of the trial court's finding that the Hyder property is community property is reversed. The matter is remanded to the trial court with directions to find the Hyder property to be the separate property of the husband. Upon remand, the trial court shall determine the amount of community funds, if any, expended upon the Hyder property and impose an equitable lien thereon for that amount.

## PALM GROVE PROPERTY

In addition to the two theories already discussed under the Hyder property, the wife urges that the Palm Grove property was transmuted from separate to community property because:

(1) the improvements were placed thereon by use of community credit;

(2) the husband expended time and effort in the development of the shopping center, which time and effort was a community asset; and

(3) the husband, by his conduct, evidenced an intent that the property be community.

As a preface to this discussion, we take as correct the trial court's findings and conclusions of law that the funds in the M.D. account, through commingling and loss of identity, were transmuted into community funds. However, as we have previously discussed, the expenditure of community funds to pay for separate property does not transform that property into community property and at most, the community has a lien for reimbursement of the amount of community funds so expended.

Also in connection with the acquisition of the bare land comprising the Palm Grove property (prior to the shopping center being built) we find no evidence to support the trial court's implicit finding that community funds were expended in its acquisition. As indicated, this property was acquired by the husband prior to his marriage to the wife. By such acquisition, it became his separate property. It is true that this property was subject to an encumbrance which was satisfied during the marriage. However, the evidence is uncontradicted that this encumbrance was satisfied by the sale of a portion of this separate property to Humble Oil Company—the escrow account evidencing this transaction shows the encumbrance to Roe was paid from the proceeds of that sale. The proceeds from the sale of separate property remain the separate property of the seller. *Davis v. Davis*, 9 Ariz.App. 49, 449 P.2d 66 (1969). Thus the Roe obligation was retired with the husband's separate property.

As to the use of community funds to retire the husband's obligation to his ex-wife Norma, for her so-called interest in this land, that transaction insofar as is pertinent here, is that if Norma had any interest in this real estate, it was converted by Norma's agreement with the husband into simply an unsecured obligation of the husband. Retirement of that unsecured obligation by community funds cannot give rise to any community lien or interest in the husband's separate property and is more properly a matter of money accounting between the husband and wife here.

We now turn to the trial court's conclusion that the placing of a shopping center on this bare land "was so substantial and complete as to cause transformation of this asset from separate property . . . to community property of the parties."

Apparently, the trial court started from the proposition that the obtaining of the construction funds (the interim financing from O'Malley-Pickrell) was a community obligation; that the improvements were therefore community property and since this community property investment was "so complete and substantial" the entire property became community. In our opinion, this reasoning is factually and legally incorrect.

**564**

First, from a legal standpoint, if in fact community funds are used to improve separate real property, the underlying real property does not become community property. *Lawson v. Ridgeway, supra.* This is for the reason that improvements become a part of the realty and acquire the characteristics, either separate or community, that the underlying real property enjoys. *Brown v. Brown,* 58 Ariz. 333, 119 P.2d 938 (1941). The Palm Grove property is the separate property of the husband. Therefore, any improvements thereon which become part of that realty are likewise separate property. The question then becomes what is the character of the funds used to improve the property—if they are community funds, the community is entitled to a lien thereon. *Tester v. Tester, supra.*

The trial court found that the "credit" of the community was used to obtain the interim financing to pay for the improvements on the property and therefore these funds were community property. This finding is based on the sole fact that the wife co-signed the promissory note to O'Malley-Pickrell. However, in that same transaction, the husband alone signed the mortgage on his "sole and separate property" to secure that note. That note was subsequently paid by the proceeds of a loan from American National which was evidenced by a promissory note and mortgage signed solely by the husband and secured by the husband's separate property. If we consider that the wife's signing the O'Malley-Pickerell note made the proceeds of that loan community (which does not necessarily follow, see *Porter v. Porter, supra*), that community property obligation was entirely paid by substituting therefor the husband's separate property obligation. Any lien for reimbursement that might attach on behalf of the community by the interim financing was extinguished when that community debt was extinguished by a separate obligation.

It should also be pointed out that the income from the major tenants of the shopping center (Lucky Stores and Super-X Drugs) is sufficient to service the underlying mortgage debt on the property. Normally, the rents from separate property remain separate property. A.R.S. § 25–213. We see no reason why this statutory pronouncement should not be given effect here.

We therefore find no legal or factual support for the trial court's conclusion that the shopping center was constructed with community funds.

However, we do find factual support for the trial court's finding that certain funds from the M.D. account were used in connection with the shopping center; that community funds were used to pay Lufkin Construction Company for additional renovation at the center; and that funds obtained from loans signed by both parties were channelled into the Palm Grove—Potthoff properties account. As to these amounts, the community has a lien on the Palm Grove property for reimbursement.

The wife also argues that the husband spent considerable time and effort in making the shopping center a paying operation and therefore this converts the underlying character of the real property from separate to community. We disagree. While it is true that *profits* from a separate business may be classified as separate or community, depending upon whether the *profit* is derived from the inherent character of the separate property or from the efforts of the community's spouse, such a characterization of profits does not affect the separate nature of the underlying property. *Cockrill v. Cockrill,* 124 Ariz. 50, 601 P.2d 1334 (1979).

In the case of the Palm Grove Shopping Center, there well may be an increase in the values of the underlying real property which is attributable to the community efforts of the husband. In such a case, that increased value would be community property.

We emphasize, however, that the separate property of the spouse remains separate. It is merely the profits or the increase in value of that property during marriage which may become community

property as a result of the work effort of the community.

*Cockrill v. Cockrill, supra,* 124 Ariz. at 52, 601 P.2d at 1336.

Upon remand, the trial court shall determine the amount of increase in value of the Palm Grove property which is attributable to the work efforts of the husband and declare the value attributable thereto to be community property. The burden is on the husband to show that this increase is the result of the inherent nature of the property and therefore separate. *Cockrill v. Cockrill, supra.*

Finally, the wife argues that through the husband's conduct, the Palm Grove property was transferred from separate to community. The conduct relied upon is the husband listing the Palm Grove Shopping Center in a financial statement of "Dr. and Mrs. Herbert Potthoff," and claiming the property to be community in federal income tax returns for the years 1967 and 1968.

The wife does not argue strenuously that merely listing the Palm Grove property in the financial statement caused a transmutation of this property. She does, however, urge that under the authority of *In re Neilson's Estate,* 57 Cal.2d 733, 22 Cal.Rptr. 1, 371 P.2d 745 (1962), the listing of the property in an income tax return caused a transmutation of this property. It is true that this case states that the fact that a husband and wife filed tax returns splitting their income before 1948 is substantial evidence that will support a transmutation. However, as the case further points out, the filing of such returns does not establish transmutation as a matter of law. Here, apparently the Palm Grove property was only listed as community property in the years 1967 and 1968, two years out of the twelve years the property could have been so listed. Under these circumstances we find this evidence insufficient even under California law to cause a transmutation.

We therefore hold that the trial court erred in finding the Palm Grove property to be community property. The matter is remanded to establish the existence of a community lien on this property, if any, and to establish the amount of increase in value, if any, of that property which may be attributable to the community efforts of the parties.

Judgment reversed and remanded.

HAIRE, P. J., and EUBANK, J., concur.