NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In re the Matter of:

OMAR ALI BASSAL, *Petitioner/Appellant*,

*v.*

KHUSHBO FANA KHALIL, *Respondent/Appellee*.

No. 1 CA-CV 23-0329 FC

FILED 09-24-2024

Appeal from the Superior Court in Maricopa County
No. FC2021-004512
The Honorable James N. Drake, Judge

**VACATED IN PART AND REMANDED**

COUNSEL

Jaburg & Wilk, P.C., Phoenix
By Kathi Mann Sandweiss
*Counsel for Petitioner/Appellant*

Convergent ADR, Phoenix
By Peter B. Swann
*Counsel for Petitioner/Appellant*

Gallagher & Kennedy, P.A., Phoenix
By Melissa Benson
*Counsel for Respondent/Appellee*

---

**MEMORANDUM DECISION**

Judge D. Steven Williams delivered the Court's decision, in which Presiding Judge Michael J. Brown and Judge Daniel J. Kiley joined.

---

**W I L L I A M S**, Judge:

¶1         Omar Bassal ("Husband") appeals from the decree dissolving his marriage to Khushbo Khalil ("Wife"). For the following reasons, we vacate the decree in part and remand for proceedings consistent with this decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2         The parties married in December 2017 and have one child, born in November 2019. In July 2021, Husband petitioned for dissolution of the marriage.[1]

¶3         Through mediated conferences, the parties agreed to a parenting plan. They failed to reach agreement on several other issues, however, including spousal support and the classification and division of certain property. The superior court held a one-day trial on contested issues and entered a decree of dissolution.

¶4         In the decree, and specific to this appeal, the superior court: (1) classified as community property 51.24% of monies received from redeemed virtual shares awarded to Husband through an employee incentive plan ("the incentive payout"); (2) classified as community property 4,228.74 shares held by a charitable lead annuity trust ("the trust"); (3) ordered Husband to pay Wife $1,063,469.16 for her one-half share of the community interest in the incentive payout and $859,977.10 for her one-half share of the community interest in the trust, for a total of $1,923,446.87, to be paid over six years in annual installments of $320,574.48; and (4) awarded Wife spousal maintenance of $3,000.00 per month for four years.

---

[1]         Husband served Wife with the petition for dissolution on October 28, 2021, terminating the marital community by operation of law. *See* A.R.S. § 25-213(B) ("Property that is acquired by a spouse after service of a petition for dissolution of marriage . . . is also the separate property of that spouse if the petition results in a decree of dissolution of marriage[.]").

**¶5**          Husband timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1) and – 2101(A)(1).

## DISCUSSION

## I.      Characterization and Allocation of the Incentive Payout and the Trust

**¶6**          Husband challenges the superior court's characterization and division of the incentive payout and the trust. Although he acknowledges a community interest in both assets, he argues, among other things, that the court overvalued the community's share in each.

**¶7**          We review the characterization of property as separate or community *de novo*. *Bell-Kilbourn v. Bell-Kilbourn*, 216 Ariz. 521, 523, ¶ 4 (App. 2007). We review the allocation of community property for an abuse of discretion. *Id.*

### A.      The Incentive Payout

**¶8**          Husband began working for an investment company ("the employer") in March 2011. In January 2016, the employer distributed a written employee incentive plan policy, backdated to January 2014. "[T]o reward both short-term and long-term performance," the plan provided for annual cash bonuses and a five-year (2014-2018) "virtual share scheme." As explained in the written policy:

> Virtual shares mimic shares in a company in order to grant employees the financial benefits of shareholding without legal ownership.
>
> . . . .
>
> Virtual shares can be issued by the [employer] and distributed to eligible employees through a process of awards, allocation and vesting . . . for the purposes of measuring and rewarding employee performance.
>
> . . . .
>
> The two key benefits to employees of holding virtual shares are the opportunity to receive dividends and the ability to redeem the underlying value of the shares:

3

*Dividends*: The dividend policy for virtual shares matches the [employer's] dividend policy for ordinary shares, making employees eligible for the same payout terms and amount as an ordinary shareholder with an equivalent number of shares[.]

*Capital value*: Employees stand to gain from increases in the [employer's] capital value as long as they hold virtual shares. Employees holding virtual shares can realize those gains by redeeming some o[r] all of their shares at any point in time after those shares vest[.]

. . . .

The allocation of virtual shares is subject to employee performance each year. As long as [participating employees] meet performance expectations in a given year[,] [they] are allocated 20% of their five-year share award in full. . . . [E]mployees who do not meet performance expectations in a given year (as defined by the HR manual) are not allocated any shares for that year.

. . . .

The virtual shares generally vest after five years--at which point they are owned by and due to eligible employees.

¶9            The policy further states that the value of virtual shares "depends on whether the [employer] achieves" its performance target, with a performance exceeding the target resulting in a higher virtual share value and a performance falling below the target corresponding to a reduced virtual share value. In fact, if the employer's performance falls far short of its target (failing to achieve at least 85% of its stated goal), the incentive plan participants "forfeit" their virtual shares entirely.

¶10          Apart from imposing collective forfeiture in the event of the employer's failure to meet its specified target, the plan provides for individual forfeiture of virtual shares if a participating employee terminates his employment before the end of the five-year period unless: (1) the employer's board of directors, in its sole discretion, opts to grant the employee his shares, or (2) the employee's termination is the result of death, disability, termination of employment by the employer without cause, or the employer's election not to renew the employee's employment contract.

**¶11** Husband enrolled in the incentive plan effective January 1, 2014. At the outset, the employer "awarded" him 415,122 virtual shares. For each of the five years, 2014 through 2018, Husband met his personal performance target, and the employer "allocated" one-fifth (83,024) of the previously "awarded" virtual shares to him.

**¶12** At the end of the five-year period, the employer notified Husband that it had met its performance target and would allocate an additional 70,643 shares to him from a "reserve" that had been held back to allow for additional plan participants, if any. Less than six months after receiving notice that his shares had vested, Husband redeemed them (September 2019), receiving their accumulated value of $4,901,132.73.

**¶13** At trial, the parties presented competing expert opinion reports and testimony concerning the proper formula for calculating the community's interest in the incentive payout. Husband's expert opined that the incentive plan primarily compensated Husband for his past labor and performance, and used a formula outlined in *In re Marriage of Hug*, 154 Cal. App. 3d 780 (1984), to calculate the community's interest in the incentive payout. Under the *Hug* formula, the community's interest in stock options equals the number of months the employee-spouse worked for the employer before the marital community terminated divided by the number of months the employee-spouse worked for the employer before the stocks became exercisable. *Brebaugh v. Deane*, 211 Ariz. 95, 100, ¶ 20 (App. 2005). Wife's expert, on the other hand, opined that the incentive plan primarily induced Husband's continued employment, and because the shares were redeemed during the marriage, the incentive payout was entirely community in nature or, in the alternative, the community held an interest in the incentive payout under the formula articulated in *In re Marriage of Nelson*, 177 Cal. App. 3d 150 (1986). Under *Nelson*, the community's interest equals the number of months between an award of stock options and the termination of the marital community divided by the number of months between the grant of the stock options and the date of exercisability. *Brebaugh*, 211 Ariz. 100, ¶ 21. Finding the employer implemented the incentive plan primarily to induce its participating employees' continued employment, the superior court adopted Wife's expert's calculation of the community's interest in the incentive payout under the *Nelson* formula.

**¶14** Although Husband and Wife relied on *Hug* and *Nelson* to support their respective positions, those cases analyze whether a community has an interest in monies received *post-dissolution* by an employee-spouse for services rendered *during the marriage*. *See Goodell v. Goodell*, 1 CA-CV 23-0366 FC, 2024 WL 2827166, at * 5, ¶¶ 32-33 (Ariz. App.

June 4, 2024) (explaining a court should apply the *Hug* formula to determine a community's interest in stock options if the employee-spouse received the stock options primarily to compensate for labor performed "during marriage" whereas a court should use the *Nelson* formula to calculate a community's interest in stock options if the employee-spouse received the stock options primarily to incentivize future (post-dissolution) performance and continued employment). By contrast, here, the question is whether the community has an interest in monies received *during the marriage* that flowed from work the employee-spouse performed *before the marriage*.

¶15 Because *Hug* and *Nelson* are inapposite, we turn to the general principles governing the characterization of property to resolve this issue. The parties have not cited, and our research has not revealed, any Arizona case addressing the characterization and division of *virtual shares*. Accordingly, we borrow from the analytic framework applied in analogous cases evaluating a community interest in stock options and pension benefits.

¶16 "The concept of community property law in Arizona is built upon two pillars[.]" *Potthoff v. Potthoff*, 128 Ariz. 557, 561 (App. 1981). First, property acquired during marriage, other than by gift, devise or descent, is community property. *Id.*; A.R.S. § 25-211(A). Second, property acquired by a spouse before marriage, and the increase, rents, issues and profits of that property, is the separate property of that spouse. *Id.*; A.R.S. § 25-213(A). Thus, in general, "property acquires its character as community or separate depending upon the marriage status of its owner at the time of acquisition." *Potthoff*, 128 Ariz. at 561. "'Time of acquisition' refers to the time at which *the right to obtain title occurs*, not to the time when legal title actually is conveyed." *Id.* (emphasis added).

¶17 "[T]he community has an interest in the property earned during the marriage." *Brebaugh*, 211 Ariz. at 98, ¶ 7; *see also Van Loan v. Van Loan*, 116 Ariz. 272, 274 (1977) (holding that to the extent a spouse acquires unvested pension benefits from community efforts, that property right is divisible upon dissolution). But "the opposite is equally true: the fruits of labor expended before marriage are separate property." *Stock v. Stock*, 250 Ariz. 352, 355, ¶ 11 (App. 2020). Indeed, even if labor expended during the marriage "cause[s] that pre-marriage property right to vest," the community does not acquire an interest in any earnings "attributed to pre-marital service." *Id.* at 355-56, ¶¶ 11, 13.

6

¶18        Accordingly, to determine whether a community has an interest in an employee-spouse's stock options or pension benefits, the salient question is not when the employee's interest in the benefits vested, but whether the employee's right to the benefits was acquired with community labor. *Van Loan*, 116 Ariz. at 273 (rejecting employee-spouse's contention that the community had only "a mere expectancy" in his pension benefits because he had not yet acquired a "vested right" to the benefits at the time of dissolution); *see also Johnson v. Johnson*, 131 Ariz. 38, 41 (1981) (reasoning that when employment benefits are earned, not when they vest, is determinative to assess whether the community acquired an interest). "That there is yet a condition to be fulfilled" before the "right to payment" vests "does not in any way vitiate" an employee-spouse's separate interest in employment benefits earned before marriage. *Van Loan*, 116 Ariz. at 274. Stated simply, to the extent an employee-spouse earns employment benefits through premarital effort, the benefits are properly characterized as separate property, and to the extent the benefits are earned through community effort, they are properly classified as community property subject to division upon dissolution. *Id.*; *see also DeFrancesco v. DeFrancesco*, 248 Ariz. 23, 25, ¶ 9 (App. 2019) (explaining that the characterization of property is not determined by when it "is received," but "whether the payment relates to services rendered during the marriage").

¶19        Applying these general principles to this case and working from the proposition that virtual shares, like unvested stock options and pension benefits, "are a form of deferred compensation to employees for services rendered," only the virtual shares earned during the marriage are community property. *Van Loan*, 116 Ariz. at 273; *Brebaugh*, 211 Ariz. at 98, ¶ 7. Meaning, the community holds an interest in the portion of the incentive payout Husband earned during the parties' marriage but no interest in the portion of the incentive payout Husband earned before the marriage.[2] The parties do not dispute that Husband received equal virtual shares each year he participated in the incentive plan. Nor do they dispute that they were married for one year and one week during that five-year period. Therefore, the community has a 20.02% interest in the $4,901,132.73 incentive payout – equaling $981,206.77 – and Wife has a one-half share in the community's interest – equaling $490,603.39.

_____

[2]        Notably, the employee tasked by the employer with designing and administering the incentive plan testified that participating employees' "legal entitlement" to virtual shares corresponded to the allocation date rather than the vesting date. Wife presented no controverting evidence.

¶20          To the extent Wife contends that Husband's interest in the incentive payout was a mere "expectancy" until 2019, we disagree. The employer's written incentive plan policy delineated specific, legally binding terms that if met, provided participating employees with an enforceable right to payment. *See DeFrancesco*, 248 Ariz. at 24, ¶ 5 (explaining that "the defining characteristic of an expectancy is that its holder has no enforceable right to its beneficence") (quotation and citation omitted).

¶21          However, consistent with the superior court's finding, the parties do not dispute that none of the incentive payout remains other than $770,000 that Husband transferred into the trust. On appeal, Wife reasserts her trial claim that Husband engaged in waste of the dissipated monies.

¶22          "In the equitable division of property, the court may consider 'excessive or abnormal expenditures, destruction, concealment or fraudulent disposition' of community property." *Goodell*, 1 CA-CV 23-0366 FC, 2024 WL 2827166, at *6, ¶ 35 (quoting A.R.S. § 25-318(C)). "A finding of waste under [A.R.S. § 25-318] allows the court to 'compensate one spouse for the misuse of the common property by the other spouse by awarding the innocent spouse a greater share of the community property to offset the value of the lost property." *Id.* (quoting *Martin v. Martin*, 156 Ariz. 452, 456 (1988)). The party alleging waste bears the burden of establishing "that the other party's disposition of community property was 'excessive or abnormal' or constituted 'destruction' of the community property." *Id.* If the alleging spouse makes such a prima-facie showing, the burden falls on the other spouse to establish the expenditures benefited the community. *Gutierrez v. Gutierrez*, 193 Ariz. 343, 346-47, ¶¶ 7-8 (App. 1998).

¶23          We review a superior court's determination of marital waste for an abuse of discretion. *See Kline v. Kline*, 221 Ariz. 564, 573, ¶ 35 (App. 2009) (citation omitted). "An abuse of discretion exists when the record, viewed in the light most favorable to upholding the [superior] court's decision, is devoid of competent evidence to support the decision." *State ex rel. Dep't of Econ. Sec. v. Burton*, 205 Ariz. 27, 30, ¶ 14 (App. 2003) (citation omitted).

¶24          In her trial exhibits, Wife itemized five transfers to Husband's parents totaling $1,221,500. Husband acknowledged two large transfers to his parents totaling $1,200,000, and did not meaningfully contest Wife's claim of three smaller transfers totaling $21,500. At trial, Husband presented no evidence that the payments to his parents extinguished a community debt or otherwise benefitted the community.

¶25        In the portion of the decree addressing the incentive payout, the superior court implied that Husband's transfer of "1.3 million dollars" to his parents constituted waste, but it did not expressly label it as such, despite Husband's request for written findings. Specifically, the court pointed out that Husband "had complete discretion over the parties' finances" during the marriage and Wife "did not acquiesce" to the transfers to his parents. Moreover, in analyzing waste as one of the statutory factors for spousal maintenance, the court characterized Husband's payment of "1.3 million dollars" to his parents "in return for his schooling and essentially, for his upbringing," as an "extraordinary expenditure."

¶26        Because Husband had no legal obligation to pay his parents the monies, the record reasonably supports the superior court's implicit findings that the community derived no benefit from the transfers and the "extraordinary expenditures" constituted waste. But even so, a finding that Husband engaged in waste of $1,221,500 of the incentive payout monies does not justify the court's award of 25.71% of the entire incentive payout (less the $770,000 transferred to the trust) to Wife – totaling $1,063,469.15 – when, as the court recognized, the funds "have been spent."

¶27        Applying the community's interest of 20.02% in the incentive payout to the transfer amount itemized by Wife ($1,221,500), the community had an interest of $244,544.30 in the monies transferred to Husband's parents, with Wife's one-half share equaling $122,272.15. Therefore, although Wife's initial share of the incentive payout was $490,603.39, following the dissipation of those monies, her remaining interest (apart from the trust) is $122,272.15, representing her one-half share of the community's interest in the wasted property.

## B.     The Trust

¶28        Before the parties married, Husband launched his own investment management company, Shukr Investments, which he both owned and operated. Apart from his short and long-term compensation from the employer, Husband received an annual salary of $100,000 from Shukr Investments during the marriage, a salary he set.

¶29        In November 2019, after redeeming the virtual shares under the incentive plan, Husband created the trust to reduce "tax exposure." Husband functions as both the donor and the trustee of the trust, managing the trust assets through Shukr Investments. During its "life," the trust makes scheduled contributions to a selected charitable organization ($80,000 per year from 2020 through 2026 and $1,474,326 in 2027), but when

it expires in 2027, the remainder will revert to Husband, the designated "remainder beneficiary."

¶30 Initially, Husband funded the trust with 9,313.30 shares of the Shukr Global Equity Fund (an entity he also owns) that he acquired in 2014, and $770,000 from the incentive payout. Husband then used $765,000 of the incentive monies to purchase 4,731.75 Shukr shares. In January 2021, the trust acquired 2,018.15 additional Shukr shares as reimbursement of Shukr Investment's performance fees.

¶31 The parties do not dispute that the community has an interest in the $770,000 incentive payout monies transferred to the trust in 2019. As explained, the community holds a 20.02% interest in the incentive payout, including the monies used to acquire the 4,731.75 Shukr shares in 2019. The parties also agree that Husband acquired the 2014 Shukr shares as his sole and separate property and that the community redeemed 222.48 Shukr shares during the marriage. According to Husband, a single Shukr share was valued at $406.73 on the date the marital community effectively terminated by statute, a valuation Wife does not contest.

¶32 Husband disputes, however, the superior court's finding that "100%" of the Shukr shares acquired by the trust in 2021 "should be viewed as community in nature." Noting that the trust acquired the 2021 Shukr shares as part of a transaction reversing the trust's payment of performance fees to Shukr Investments, Husband argues that the community's share "before the issuance of [the 2021] shares should have remained the same after the issuance of [the 2021] shares." In other words, Husband argues that because the trust paid the performance fees to Shukr Investments on behalf of all the trust's assets, the reimbursement shares have the same character (ratio of separate to community) as the underlying assets. But to determine the character of the 2021 Shukr shares, the relevant question is not the character of the existing assets at the time the trust paid the monies to Shukr Investments but whether the performance fees compensated for labor Husband performed during the marriage as the trust's investment manager. Husband's contention "that a simple reversal of fees should not impact the characterization" of trust assets fails to recognize that the performance fees constituted compensation for Husband's labor, which he performed through Shukr Investments.

¶33 Although Husband's expert stated his "understanding that the performance fee reversal relates to fees incurred since the first Shukr Shares were acquired in June 2014," and "[t]herefore, it is necessary to allocate the Shukr Shares that were recorded when the performance fees

were reversed to the time period prior to the marriage and during the marriage," Husband did not create the trust until 2019. Apart from his expert's "understanding," Husband points to no evidence demonstrating that any portion of the performance fees relate to premarital labor. Absent such evidence, the return of the performance fees to the trust in the form of Shukr shares does not change the nature of the performance fees – community earnings derived from Husband's labor as an investment manager. Because Husband failed to rebut the presumption that earnings received during marriage constitute community property, the superior court properly characterized the 2,018.15 Shukr shares acquired in 2021 as entirely community property, but only 20.02% of the Shukr shares (947.30) acquired in 2019 constitute community property.

¶34        Next, Husband challenges the superior court's order requiring him to pay Wife her one-half share of the community's interest in the trust over the next six years. Pointing to expert testimony that the trust is irrevocable and he cannot invade its assets, Husband argues he should not be required to pay Wife her share of the trust until it terminates in 2027, the remaining assets revert to him, and the residual value is fixed.

¶35        "There are occasions when it is virtually impossible to effectively divide the property of the spouses, i.e., equipment of a business, inventory, stock in closely held business, etc." *Martin*, 156 Ariz. at 457. In such circumstances, A.R.S. § 25-318 "authorizes the court to make an equitable division of such property by awarding an amount of money to one spouse representing that spouse's share of the value of the property," while "set[ting] aside" the specific property for the other spouse. *Id.*

¶36        Arizona courts recognize two methods for fashioning a monetary award to equitably compensate one spouse for her community share of indivisible property such as stocks and pension benefits. *See Johnson*, 131 Ariz. at 40-42; *see also Brebaugh*, 211 Ariz. at 98, ¶ 10 (explaining the court has "broad discretion to fashion approaches [for the division of community property] which will achieve the most equitable results under the facts of each case") (internal quotation omitted); *Neal v. Neal*, 116 Ariz. 590, 594 (1977) (explaining the superior court has "great discretion in the apportionment of the community assets"). Under the "present cash value method," the court determines the community's interest in the asset, calculates the present cash value of that interest, and awards half of that amount to one spouse in a lump sum, allowing the other spouse to receive the asset in the natural course "free of community ties." *Johnson*, 131 Ariz. at 41. "Under the 'reserved jurisdiction method,' the court determines the

formula for division at the time of the decree but delays the actual division" until the asset is realized. *Id.*

¶37 "The present cash case value method provides a number of advantages over the reserved jurisdiction method." *Id.* "The former spouses are spared further entanglement because the litigation is completed, and the problems of continued court supervision and enforcement . . . are avoided." *Id.* at 42. As declared by our supreme court, "the present cash value method is preferred if the [indivisible asset] can be valued accurately and if the marital estate includes sufficient equivalent property to satisfy the claim[.]" *Id.*

¶38 Citing Husband's "complete discretion over the parties' finances" during the marriage, Wife's lack of agreement to forming the trust or transferring money to Husband's parents, and the potential for Husband "to manipulate future payouts" when the trust terminates through his "nested legal entities," the superior court expressed considerable "concern" with leaving any portion of Wife's financial interests in Husband's "control." For this reason, the court ordered Husband to pay Wife her one-half share of the community's interest in the incentive payout and the trust (separating out the $770,000 transferred to the trust from the incentive payout to avoid double counting). In so doing, the court clarified that it did not "order[] that funds be removed or withdrawn" from the trust, leaving the "source" of the payment to Husband's "discretion."

¶39 The trust document clearly states that the trust "shall be irrevocable." But the irrevocable nature of the trust is not dispositive. The superior court did not order Husband to dissolve the trust or change its terms. Instead, the court ordered Husband to pay Wife for her share of the trust's value, leaving the "source" of the payment to Husband's discretion. The trust document specifically provides that the trustee, Husband, has the power to "borrow money . . . whether by mortgage, deed of trust, pledge or otherwise." Thus, under the terms of the trust document, Husband may encumber the trust to obtain the monies to pay Wife her one-half share of the community's interest, *cf. Boncoskey v. Boncoskey*, 216 Ariz. 448, 451-52, ¶¶ 16-17 (App. 2007) (approving use of the reserved-jurisdiction method when no community assets were available to satisfy the non-employee spouse's community interest and the pension rights had not yet matured), and on this record, Husband has not demonstrated that requiring him to borrow against his future, remainder interest in the trust would cause undue hardship, *see Johnson*, 131 Ariz. at 42 (explaining preference for present-cash-value method unless the employee spouse cannot "satisfy the claim of the non-employee spouse without undue hardship"). While the

court had the discretion to establish the percentage of the community's interest, retain jurisdiction over the matter pending the expiration of the trust, and then order the division of the remainder of the trust assets at that time, given Husband's sole control of the trust in the meantime, and deferring to the court's ability to observe the parties and assess their credibility, Husband has not shown that the court abused its discretion by ordering him to pay out Wife's interest in the trust. *See Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).

**¶40** In sum, the community holds a 20.02% interest in the 4,731.75 shares acquired in 2019 (947.30 shares), a 100% interest in the 2,018.15 shares acquired in 2021, and a 100% interest in the 222.48 shares redeemed during the marriage. Therefore, 2,742.97 shares constitute community property. Using Husband's share valuation of $406.73, the community's interest in the trust on the date the community terminated equaled $1,115,648.19. Of this amount, Wife's one-half community share equaled $557,824.09. Apart from her interest in the trust, however, Wife is also entitled to her one-half share of the community's interest in the incentive monies Husband transferred to his parents, $122,272.15. Therefore, Wife's interest in the incentive payout and trust equals $680,096.24.

## II.     Award of Spousal Maintenance

**¶41** Husband challenges Wife's spousal maintenance award. First, he contests Wife's eligibility under the governing statutory framework. Second, he argues the superior court awarded Wife maintenance in a greater amount and for a longer period than warranted.

**¶42** We review a spousal maintenance award for an abuse of discretion. *Gutierrez*, 193 Ariz. at 348, ¶ 14. In so doing, we will affirm the superior court's order if reasonable evidence supports it. *Id.*

**¶43** When considering a request for spousal maintenance, the superior court must first assess the requesting spouse's eligibility. A.R.S. § 25-319(A); *In re Marriage of Cotter*, 245 Ariz. 82, 85, ¶ 7 (App. 2018). If the court finds the requesting spouse eligible for spousal maintenance, it then determines the amount and duration of any award. A.R.S. § 25-319(B); *Cotter*, 245 Ariz. at 85, ¶ 7.

**¶44** In making the threshold eligibility determination, the court considers five factors, any one of which establishes the requesting spouse's eligibility:

1. Lacks sufficient property, including property apportioned to the spouse, to provide for that spouse's reasonable needs.

2. Lacks earning ability in the labor market that is adequate to be self-sufficient.

3. Is the parent of a child whose age or condition is such that the parent should not be required to seek employment outside the home.

4. Has made a significant financial or other contribution to the education, training, vocational skills, career or earning ability of the other spouse or has significantly reduced that spouse's income or career opportunities for the benefit of the other spouse.

5. Had a marriage of long duration and is of an age that may preclude the possibility of gaining employment adequate to be self-sufficient.

¶45        As outlined in the decree, the superior court considered each statutory factor and determined that Wife was eligible for a spousal maintenance award because she: (1) lacked "almost any property of her own and certainly nothing that would provide a sufficient income stream to meet reasonable needs," and (2) significantly reduced her income and career opportunities, finding she "testified credibly" that Husband did not support her "working outside of the home."

¶46        As noted, we defer to the superior court's assessment of witnesses' credibility and do not reweigh the evidence. *Hurd v. Hurd*, 223 Ariz. 48, 52, ¶ 16 (App. 2009). Applying that standard, no evidence supports the court's finding that Wife lacked "almost any property." To the contrary, the decree allocated over $2,000,000 in cash to Wife. Even as reallocated on appeal, Wife will receive over $770,000 in cash ($680,096.24 plus $91,729.50 from the uncontested division of community bank accounts). The record does support, however, the court's findings that upon the parties' marriage, Wife quit her job at an American university, relocated to Saudi Arabia to live with Husband, and that Husband discouraged her from pursuing any employment opportunities during the marriage. Therefore, Wife qualifies for spousal maintenance under A.R.S. § 25-319(A)(4).

¶47        Under A.R.S. § 25-319(B), the superior court may award spousal maintenance "only for a period of time and in an amount necessary to enable the receiving spouse to become self-sufficient." In considering the

duration and amount of maintenance, the court must consider together and weigh all relevant statutory factors. *See Rainwater v. Rainwater*, 177 Ariz. 500, 502 (App. 1993) (explaining the court "need not apply every factor," only those that are applicable on a "case-by-case" basis); *Cullum v. Cullum*, 215 Ariz. 352, 355, ¶ 15 (App. 2007) ("The determination by the court is done on a case-by-case basis and some factors will not apply."). In this case, the relevant factors include:

1. The standard of living established during the marriage.

2. The duration of the marriage.

3. The age, employment history, earning ability and physical and emotional condition of the spouse seeking maintenance.

4. The ability of the spouse from whom maintenance is sought to meet that spouse's needs while meeting those of the spouse seeking maintenance.

5. The comparative financial resources of the spouses, including their comparative earning abilities in the labor market.

6. The contribution of the spouse seeking maintenance to the earning ability of the other spouse.

7. The extent to which the spouse seeking maintenance has reduced that spouse's income or career opportunities for the benefit of the other spouse.

8. The ability of both parties after the dissolution to contribute to the future educational costs of their mutual children.

9. The financial resources of the party seeking maintenance, including marital property apportioned to that spouse, and that spouse's ability to meet that spouse's own needs independently.

10. The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment and whether such education or training is readily available.

11. Excessive or abnormal expenditures, destruction, concealment or fraudulent disposition of community, joint tenancy and other property held in common.

A.R.S. § 25-319(B).

¶48        Applying these factors to this case, the superior court found: (1) "the parties enjoyed a lavish lifestyle while married," (2) the marriage lasted less than four years, (3) Wife has a graduate degree and employment experience, but quit her job after the marriage and did not work outside the home because Husband wanted her to focus on "wifely duties," (4) Husband sets his own salary, "artificially depressed" at $100,000 per year, (5) Husband's "financial resources and earning ability exceed those of [Wife]," (6) Wife "worked in the home so that [Husband] could fully dedicate his efforts to working," and (7) Husband's transfers of over $1.2 million to his parents constituted "an extraordinary expenditure." Based on these findings, the court ordered Husband to pay Wife $3,000 per month for four years.

¶49        Record evidence supports each of the superior court's findings. Although Husband denies artificially depressing his salary, noting his business has reported significant losses, the record reflects that Husband earned a substantially higher income historically, both before and during the marriage. And although Wife will receive substantial cash from the dissolution, it is not clear how much time it will take to convert that cash to income-producing assets. Therefore, on this record, the court did not abuse its discretion by entering the spousal maintenance award.

**CONCLUSION**

**¶50** For the foregoing reasons, we vacate the dissolution decree in part and remand for proceedings consistent with this decision. Both parties request an award of attorneys' fees under A.R.S. § 25-324, which authorizes an award of attorneys' fees after considering both parties' financial resources and the reasonableness of their positions on appeal. In our discretion, we deny both requests. Each party has prevailed in part and therefore both are responsible for their own costs on appeal.



AMY M. WOOD • Clerk of the Court
FILED: AGFV