NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

In re the Matter of:

CHERYL A. HOWIE, *Petitioner/Appellee/Cross-Appellant*,

*v.*

SCOTT D. HOWIE, *Respondent/Appellant/Cross-Appellee*.

No. 1 CA-CV 23-0587 FC

FILED 02-13-2025

Appeal from the Superior Court in Coconino County
No. S0300DO201900439
The Honorable Fanny Steinlage, Judge *Retired*
The Honorable Elaine Fridlund-Horne, Judge
The Honorable Cathleen Brown Nichols, Judge *Retired*

**AFFIRMED IN PART,
REVERSED AND REMANDED IN PART**

COUNSEL

Berkshire Law Office, PLLC, Tempe
By Alexandra Sandlin, Keith Berkshire
*Counsel for Petitioner/Appellee/Cross-Appellant*

Walneck Law, Scottsdale
By Edward J. Walneck
*Counsel for Respondent/Appellant/Cross-Appellee*

---

## MEMORANDUM DECISION

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge David D. Weinzweig joined.

---

**K I L E Y**, Judge:

**¶1**         Scott Howie ("Husband") and Cheryl Howie ("Wife") each challenge certain provisions of the decree (the "Decree") that dissolved their marriage. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

**¶2**         Husband and Wife were married in 1998 and have two children. During the marriage, Husband was employed as a consultant for Broadcom Inc. ("Broadcom"). Wife worked in sales until approximately 2003, when she left the workforce to be the primary care provider for the parties' children. Wife re-entered the workforce in 2020, with limited success. The parties accumulated substantial assets during the marriage, including two residences, one in Cave Creek and one in Flagstaff; rental properties; financial accounts; vehicles; and numerous other items of personal property.

**¶3**         Wife filed the petition for dissolution of marriage in October 2019.

**¶4**         In February 2020, the superior court entered temporary orders for legal decision-making, parenting time, child support, and spousal maintenance. As relevant here, the court ordered Husband to make monthly payments toward certain community debts (including the mortgage and related expenses for the parties' residences and rental properties) and awarded Wife monthly maintenance of $1,200 and child support of $1,039. A little over a month later, Wife filed a contempt petition alleging that Husband had failed to make payments toward community expenses as required. Several months later, Wife filed an amended petition for contempt alleging, *inter alia*, that Husband had failed to pay temporary spousal maintenance and child support as ordered.

¶5            In July 2020, Wife moved for an order compelling disclosure of certain financial records. Following a hearing in September 2020, the court granted Wife's motion to compel and awarded her attorney fees.

¶6            After an evidentiary hearing in November 2020, the superior court found Husband in civil contempt for failing to pay temporary spousal maintenance and child support as ordered. The court ruled that Husband owed Wife past due support totaling $6,933, and again awarded Wife attorney fees.

¶7            In March 2021, Wife filed a petition for contempt with respect to the September 2020 order compelling disclosure. In June 2021, Husband moved to dismiss the contempt action, alleging that he had provided the required disclosure. After further filings, the parties entered a stipulation that Husband was in contempt of the court's disclosure orders. The court again awarded Wife attorney fees.

¶8            After lengthy pretrial proceedings and a nine-day trial, the superior court issued a detailed 89-page ruling (the "Under Advisement Ruling") resolving the parties' disputes over marital property and debt, spousal maintenance, and child support.[1] After resolving the parties' disputes over attorney fees and certain other issues, the court entered the Decree which incorporated the provisions of the Under Advisement Ruling.

¶9            After the entry of the Decree, Husband's timely appeal and Wife's timely cross-appeal followed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1) and 12-2101(A)(1), (2).

**DISCUSSION**

¶10            The superior court's comprehensive Under Advisement Ruling set forth findings and determinations on all disputed issues and awarded spousal maintenance, calculated past child support, allocated the marital assets, and apportioned responsibility for community debts. Most of these findings and determinations are unchallenged on appeal. Husband challenges the court's orders allocating certain financial assets and items of tangible personal property, the amount of his monthly spousal maintenance obligation, the court's failure to order reimbursement for community expenses he claimed to have paid with separate funds during

---

[1] As both of the parties' children had turned eighteen before the Under Advisement Ruling was issued, the court did not address legal decision-making or parenting time.

the pendency of these proceedings, and the award of attorney fees to Wife. Wife challenges only the court's orders dividing certain financial accounts.

¶11 We review de novo the superior court's categorization of property as separate or community, but review the superior court's allocation of that property under an abuse of discretion standard. *Whitt v. Meza*, 257 Ariz. 149, __, ¶ 27, 545 P.3d 931, 939 (App. 2024); *see also Boncoskey v. Boncoskey*, 216 Ariz. 448, 451, ¶ 13 (App. 2007) ("In apportioning community property between parties at dissolution, the superior court has broad discretion to achieve an equitable division, and we will not disturb its allocation absent an abuse of discretion."). We review awards of spousal maintenance and attorney fees under A.R.S. § 25-324(A) for abuse of discretion. *See Gutierrez v. Gutierrez*, 193 Ariz. 343, 348, ¶ 14 (App. 1998) (spousal maintenance); *Alulddin v. Alfartousi*, 255 Ariz. 436, 443, ¶ 26 (App. 2023) (attorney fees under A.R.S. § 25-324(A)). Likewise, we review a court's imposition of sanctions under an abuse of discretion standard. *Kelly v. Kelly*, 252 Ariz. 371, 375, ¶ 16 (App. 2021). Further, "[w]e will defer to the trial court's determination of witnesses' credibility and the weight to give conflicting evidence." *Gutierrez*, 193 Ariz. at 347, ¶ 13. We do not reweigh evidence on appeal, *Lehn v. Al-Thanayyan*, 246 Ariz. 277, 286, ¶ 31 (App. 2019), and will uphold the superior court's findings of fact absent clear error. *Kelsey v. Kelsey*, 186 Ariz. 49, 51 (App. 1996).

I.      **Marital Property**

        A.      **The Retirement Accounts**

                1.      **The Court's Ruling Dividing the Retirement Accounts Did Not Explain, and the Record Does Not Support, the Use of Different Valuation Dates and Methods of Division.**

¶12 The parties had five retirement accounts during the marriage: an individual retirement account ("IRA") with Forge Trust, account number ending in -9911 (the "9911 account"), a Roth IRA with Forge Trust, account number ending in -9923" (the "9923 account"), an IRA with IRA Services Trust, account number ending in -9482 (the "9482 account"), a Roth IRA with IRA Services Trust, account number ending in -6620 (the "6620 account"), and a 401(k) account with Husband's employer (the "Broadcom 401k"). The superior court ordered that the 9482 account be divided by means of a qualified domestic relations order ("QDRO"), with each party "receiv[ing] one half of the value of the account, including any losses and gains that accrued up to" the issuance of the Decree. The court did not, however, order that any other retirement account be divided by QDRO, nor

did the court order that any other account be valued as of the date of dissolution. Instead, the court awarded the 9911 account to Wife and ordered her to make an equalization payment to Husband equal to 15 percent of the account's value when the marital community terminated upon service of the petition for dissolution of marriage in October 2019. The court awarded the three remaining accounts to Husband, ordering him to make an equalization payment to Wife equal to one-half the value of the account when the marital community terminated. Both parties challenge various aspects of the court's allocation of the retirement accounts.

¶13 Wife asserts that all five of the retirement accounts should be divided by reference to their value at the time of dissolution, not when the petition was served at the beginning of the case. Noting, correctly, that the court found that all of the retirement accounts were community property, Wife argues that both spouses were entitled to share in the increase in value of these accounts over the pendency of these lengthy proceedings.[2] By directing that the accounts be divided by reference to their value when the proceedings began in October 2019, she maintains, the court "deprive[d] [her] of the gains" these accounts enjoyed between the initiation of these proceedings in 2019 and the issuance of the Decree almost four years later. Asserting that "losing out on years of gains" is not "an equitable result," she asks that the order "dividing the parties' retirement accounts . . . be vacated, and remanded" with instructions that all of the accounts be valued as of the date of dissolution, not the date of service. In his briefing, Husband does not respond to Wife's arguments on this point.

¶14 When dividing marital property, the superior court has broad discretion to determine the appropriate date of valuation. *Sample v. Sample*, 152 Ariz. 239, 242 (App. 1986) ("[T]he choice of a valuation date should be dictated by largely pragmatic considerations, and . . . it is the equitableness of the result that must stand the test of fairness on review." (cleaned up)). In *Meister v. Meister*, 252 Ariz. 391 (App. 2021), the husband challenged the court's valuation of a jointly owned business as of the time of service of the petition for dissolution, arguing that the valuation date failed to account for a "significant" loss in value that the business experienced "after the divorce proceedings began." *Id*. at 394, ¶ 1. Finding "[no] Arizona authority mandating or even suggesting a community asset must be valued at or near the date of service," this Court held, instead, that a trial court's determination of a valuation date "must comport with principles of fairness

---

[2] Wife acknowledged in her trial testimony that Husband should be awarded the increase in value of the Broadcom 401k that is attributable to deposits he made from his paycheck after the date of service.

and equity." *Id.* at 396, 397, ¶¶ 15, 17. While a trial court "may use the date of service, or a date near the date of service, as a starting point in choosing the valuation date," we held, "the [trial] court must select a different date when necessary to ensure an equitable result." *Id.* at 397, ¶ 18. The trial court abused its discretion, we concluded, by valuing the community business as of the date of service without "factor[ing]" in the events that occurred after service that negatively affected the business's value. *Id.* at ¶ 19.

**¶15**         Here, Wife asserts, and Husband does not dispute, that the retirement accounts increased in value over the course of the lengthy dissolution proceedings, a fact that militates in favor of valuing the accounts as of the end of these proceedings, not the beginning. A.R.S. § 25-211(B)(2) ("[S]ervice of a petition for dissolution of marriage . . . does not . . . [c]hange the status of community property used to acquire new property or the status of that new property as community property."); *see also Schickner v. Schickner*, 237 Ariz. 194, 199, ¶ 22 (App. 2015) (noting that "the community is generally entitled to the profits and gains attributable to community assets" (cleaned up); "[T]he service of a petition for dissolution does not alter the status of preexisting community property." (citation omitted)).

**¶16**         Although Husband testified at trial that he was entitled to the benefit of the increased value of his retirement accounts because he "actively manage[d]" them, Wife disputed Husband's testimony on this point. Management of the accounts was not "very labor-intensive," she testified, and their increased value was due not to Husband's efforts, but to "market gains."

**¶17**         The effect of the court's decision to value the 9923 account, the 6620 account, and the Broadcom 401k as of the date of service was to award, to Husband, all of the increase in their value during the pendency of the proceedings. Likewise, the effect of the court's decision to value the 9911 account as of the same date was to award Wife all of the increase in its value during the proceedings. But to the extent the retirement accounts' increased value was due to market forces and not the labor of either spouse, the marital community was entitled to share equally in their increased value. *See Sample v. Sample*, 152 Ariz. 239, 242 (App. 1986) (recognizing that the marital community is entitled to the increased value of a community account when account "appreciated solely from market forces"). The court made no findings, however, about whether the increased value of any of the accounts was due to market forces, Husband's investment management activities, or a combination of factors. Absent such findings, we cannot affirm the court's unexplained decision to value those four accounts as of the date of termination. *See Wineinger v. Wineinger*, 137 Ariz. 194, 198 (App.

1983) ("The trial court is not required to divide community property exactly equally," but "it cannot . . . make its award arbitrarily.").

¶18        Both parties challenge the court's order requiring a QDRO for the 9482 account but not the others. Husband, for example, asserts that the court erred in failing "to divide all the retirement [accounts] in the same manner," contending that treating the retirement accounts "differently" necessarily leads to "an inequitable result." Wife likewise contends that the manner in which the court divided the retirement accounts did "not accomplish an equitable result."

¶19        The parties disagree, however, on the appropriate remedy. Wife argues that all five retirement accounts should be divided by QDRO. Husband, by contrast, maintains that none of them should be divided by QDRO, asserting that ordering equalization payments instead will spare the parties the expense of QDRO preparation.

¶20        QDROs are often used to allocate pension and other retirement assets between spouses. A QDRO may not be necessary, however, when dividing certain types of retirement accounts. *Welch v. Welch*, 886 S.E.2d 921, 924 (N.C. App. 2023) (noting that husband's IRA could be divided by court order without a QDRO). Although a court is not required to order the division of retirement accounts by QDRO, *see id.*, a court may not divide marital property in an arbitrary manner. *Wineinger*, 137 Ariz. at 198.

¶21        Neither the Under Advisement Ruling nor the Decree contain any findings that would justify valuing the 9482 account as of the date of dissolution but the other four accounts as of the date of service. Nothing in the Under Advisement Ruling nor the Decree explains why a QDRO should be used to divide only the 9482 account and not the others. An arbitrary decision is, by definition, an abuse of discretion. *See Avila v. Ariz. Dep't of Econ. Sec.*, 160 Ariz. 246, 248 (App. 1989) (citing *State v. Thomas*, 142 Ariz. 201, 204 (App. 1984)) ("An abuse of discretion is characterized by arbitrariness or capriciousness and failure to conduct an adequate investigation into the relevant facts."). In the absence of any explanation, or justification apparent from the record, for the court's decision not to treat the five accounts in a consistent manner, we are constrained to find an abuse of discretion. *See Boyle v. Boyle*, 231 Ariz. 63, 65, ¶ 8 (App. 2012) (citation omitted) (noting that a court abuses its discretion by "making a discretionary ruling that the record does not support"); *see also City of Phoenix v. Geyler*, 144 Ariz. 323, 330 (1985) (holding when the trial court identifies "[n]o grounds for its action . . . and none clearly appear[] from the record, we are not disposed to assume that the trial court exercised its

discretion and denied relief for some proper and permissible reason"). We therefore reverse the court's orders for the division of the parties' five retirement accounts and remand for a redetermination of the date of valuation and method of division in a consistent manner unless the court makes a specific finding that equity requires that one or more of these accounts be treated differently from the rest.

## 2. The Record Does Not Support the Unequal Division of the 9911 Account.

¶22 Wife opened the 9911 account in 2012, funding it with monies from several accounts she owned before the marriage. The superior court found that although the "source funds" for the account were Wife's separate property, the funds in the account were later commingled with community funds and "the identity of the [source funds] as separate property [was] lost." The court further found that Wife failed to "rebut[], by clear and convincing evidence, the presumption that [the 9911 account was] community property." The court nonetheless ordered an unequal division of the funds in the account, determining that "fairness and equity" required that Wife be awarded 85 percent of the funds in the account while Husband received the remaining 15 percent. The court therefore awarded the 9911 account to Wife, and ordered her to make an equalization payment to Husband in the amount of 15 percent of the balance in the account. In dividing the 9911 account unequally, the court noted that it "considered [the] length of the marriage, the contributions of each spouse to the community, and the source of funds used to acquire the property."

¶23 Husband challenges the court's 85% - 15% division of the funds in the 9911 account, asserting that the court erred by determining that the account should "be divided in any manner other than a 50-50 equitable division." Wife does not challenge the court's finding that she did not "demonstrate, by clear and convincing evidence[,] what portion" of the funds in the 9911 account "is her sole and separate property," a burden that rests with her, *see Cooper v. Cooper*, 130 Ariz. 257, 259-60 (1981). Wife nonetheless argues that the court acted within its discretion in ordering "the unequal division" of the 9911 account because, she contends, "the account was largely funded with separate property."

¶24 A court must allocate marital property "equitably." A.R.S. 25-318(A). Usually, an "equitable" allocation of marital property will be a "substantially equal[]" division. *In re Marriage of Inboden*, 223 Ariz. 542, 544, ¶ 6 (App. 2010). While a trial court has discretion to award marital property in an unequal manner to achieve an equitable result, *see Goodell v. Goodell*, 257 Ariz. 536, __, ¶ 25, 551 P.3d 1177, 1184 (App. 2024), the court's discretion

is not unlimited. *See Kohler v. Kohler*, 211 Ariz. 106, 107, ¶ 2 (App. 2005) (noting that while "the trial court's equitable apportionment of community property" will not be disturbed "absent an abuse of discretion," an abuse of discretion may be found "when a trial court commits an error of law in the process of exercising its discretion" (citations omitted)). Dividing jointly held property into equal shares generally is the most equitable approach, unless a sound reason exists for making a different division. *Toth v. Toth*, 190 Ariz. 218, 221 (1997).

**¶25**          When one spouse's separate contribution to a community account loses its separate character by commingling with community funds, the court may not continue to treat the spouse's contribution as separate and divide the community account unequally. *Marriage of Inboden*, 223 Ariz. at 545, ¶ 12 (holding that trial court "abused its discretion when it ordered a substantially unequal distribution of . . . jointly titled marital property only for the purpose of reimbursing each spouse for their respective financial contributions to the purchase of the property"); *In re Marriage of Flower*, 223 Ariz. 531, 535, ¶ 15 (App. 2010) ("[A] court may not order a substantially unequal division of [jointly held] property solely to reimburse the purchasing spouse.").

**¶26**          Wife asserts that the court's award to her of 85 percent of the funds in the 9911 account was consistent with *Toth v. Toth*, 190 Ariz. 218 (1997). In *Toth*, the day after an 87-year-old man married a 66-year-old woman, he used $140,000 of his separate funds to purchase a house for the couple. *Id.* at 219. The couple separated two weeks later and, in less than a month, the marriage ended when the husband filed a petition for an annulment. *Id.* The trial court awarded the wife $15,000 for her interest in the house. *Id.* On appeal, the wife challenged the award, insisting that because the house was jointly titled in the name of both spouses, she was entitled to a share equal to that of the husband. *Id.* The Arizona Supreme Court disagreed and affirmed the trial court's unequal division of the house. *Id.* at 221. In so holding, the *Toth* court noted that A.R.S. § 25-318(A) requires that marital property be divided "equitably" rather than "equally." *Id.* Because the husband "paid for [the] property entirely from his separate funds" and "[t]he marriage lasted two weeks, allowing no time for a marital relationship to develop," the *Toth* court held that the trial court did not abuse its discretion in determining that an equal distribution of the house would not be equitable. *Id.* at 221-22. As the *Toth* court noted, however, "an equal distribution of joint property" is "equitable" in "most cases," and a different result was warranted only due to the "unusual" facts of that case. *Id.* at 221.

¶27        The facts of the present case are wholly unlike those of *Toth*. The duration of the Toths' marriage was measured in days, while Husband and Wife were married for over 21 years. The asset at issue in *Toth* – a house – was purchased one day after the parties' marriage using what were indisputably the husband's separate funds. Here, by contrast, the parties were married for fourteen years before Wife opened the 9911 account, and community funds were added to this account over the next seven years. The narrow holding of *Toth* based on the unusual facts of that case has no application here.

¶28        In awarding 85 percent of the funds in the 9911 account to Wife, the court noted three factors: "the length of the marriage," "the contributions of each spouse to the community," and "the source of funds used to acquire the property." While the first factor may justify an unequal division of marital property if the marriage was too brief to "allow[] . . . time for a marital relationship to develop," *Toth*, 190 Ariz. at 221, nothing about the length of the parties' two-decade marriage here could justify an unequal division of marital assets. *See id.* at 222 (noting that it is "likely in any real marriage of any significant duration" that "a division [of marital assets] based solely on reimbursement" would be "clearly inappropriate").

¶29        Likewise, the court made no finding, and nothing in the record suggests, that Husband's contribution to the community was so negligible as to warrant an unequal division of marital assets. *See Marriage of Inboden*, 223 Ariz. at 547, ¶ 17 ("[I]f a spouse contributes to the marital relationship as a whole[,] . . . then an unequal property division would not be justified so long as these contributions were not completely negligible." (citation omitted)).

¶30        In considering the "source of the funds," the court noted that Wife contributed her separate funds to the 9911 account while Husband contributed no separate funds of his own. But Husband's failure to contribute separate funds to the 9911 account is irrelevant. The principle that separate funds in an account become transmuted into community property if their separate character is lost through commingling applies irrespective of whether both spouses, or only one, contributed separate funds to the account. *See Cooper*, 130 Ariz. at 259-60 (reversing trial court's finding that savings account was wife's separate property, where account consisted of wife's separate funds and funds belonging to the community and wife "did not sustain her burden of demonstrating which portion of the monies in the account retained their separate character"); *see also Potthoff v. Potthoff*, 128 Ariz. 557, 563 (App. 1981) (holding that, where husband and wife maintained one shared bank account and both contributed separate funds to the account, the funds in the shared account, "through

commingling and loss of identity, were transmuted into community funds"). The fact that Wife contributed separate funds to the 9911 account while Husband did not cannot, by itself, justify a substantially unequal division of that account.

¶31 In support of the court's unequal division of the 9911 account, Wife cites her own trial testimony that she signed the paperwork to open the 9911 account only at Husband's rather aggressive insistence, and that she was unable to trace the funds in the 9911 account because Husband refused to disclose financial records during the pendency of these proceedings. But the court made no findings on these matters. In any event, Husband's alleged failure to disclose financial records relating to the 9911 account cannot justify dividing that account unequally. While a court may consider a party's obstructionist litigation tactics in awarding fees, *see* A.R.S. § 25-324(A) (stating court may award fees "after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings"), and may impose sanctions on a party that fails to abide by disclosure and discovery obligations, *see* Ariz. R. Family Law P. ("ARFLP") 65(b), a court may not award marital assets to one spouse to punish the other for litigation misconduct. *Cf.* A.R.S. § 25-318(A) ("[T]he court shall . . . divide the community, joint tenancy and other property held in common equitably, though not necessarily in kind, without regard to marital misconduct."); *Hatch v. Hatch*, 113 Ariz. 130, 133 (1976) ("Property may not be distributed in order to reward one party or punish the other.").

¶32 Because the reasons cited by the court do not justify its unequal division of the funds in the 9911 account, we reverse that aspect of the Decree and remand for a determination of "substantially equal" division of the 9911 account. *See Marriage of Inboden*, 223 Ariz. at 546, ¶ 14.

### B. The Broadcom RSUs

#### 1. Because the Broadcom RSUs Were Awarded to Husband During the Marriage, the Court Correctly Applied the Presumption that They Were Community Property.

¶33 During the marriage, Broadcom awarded Husband 1,240 restricted stock units ("RSUs")[3], most of which had not yet vested at the

---

[3] A restricted stock unit is a form of compensation that confers on an employee the right to receive one share of stock on a future specified date. *Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1142 (D. Ariz. 2016).

time of trial. Noting that RSUs awarded during an employee-spouse's marriage "are presumed to be community property, regardless of whether vested or unvested," the court held that Husband failed to present the "clear and convincing evidence" necessary to rebut the presumption. The court observed that an employee-spouse "can seek to rebut the presumption . . . by presenting clear and convincing evidence regarding the employer's purpose for awarding the shares," but held that Husband had failed to do so. Although Husband testified about his understanding of Broadcom's purpose in issuing the RSUs, the court noted, Husband presented no employment agreement or other documentary evidence, nor any "testimony whatsoever from a representative of Broadcom," to establish Broadcom's intent. Finding Husband's testimony insufficient to "rebut the presumption that the 1,240 shares are community property," the court proceeded to determine the value of the community portion of the RSUs by applying the formula set forth in *In re Marriage of Hug*, 154 Cal.App.3d 780, 201 Cal. Rptr. 676 (1984). Finding that the community owned 382.85 of the RSUs and that each RSU had a value of $290.30 at the time the marital community terminated, the court ordered Husband to pay Wife $55,571 for her one-half share of the value of the community's RSUs (382.85 x $290.30 = $111,141.35 ÷ 2 = $55,570.68).

¶34 Husband argues that the superior court erred in determining that his unvested Broadcom RSUs were community property. He argues, first, that the presumption that property acquired during the marriage is community in nature does not apply to unvested RSUs. Before applying the "community" presumption, he contends, a court must answer "the threshold question" of whether unvested RSUs were "acquired" during the marriage. To answer that question, he contends, the court must determine the purpose for which the employer issued the unvested RSUs. A court cannot properly find unvested RSUs that are awarded during the marriage to be community property, he maintains, unless the court first finds that the unvested RSUs were awarded as a reward for the employee's past services that were provided during the marriage.

¶35 The presumption that all property acquired during the marriage is community in nature applies to vested and unvested interests in property created during the marriage. *See, e.g.*, *Johnson v. Johnson*, 131 Ariz. 38, 41 (1981) ("[I]t is well settled in Arizona and elsewhere that pension rights, whether vested or non-vested, are community property insofar as the rights were acquired during [the] marriage[.]"); *Van Loan v. Van Loan*, 116 Ariz. 272, 274 (1977) (rejecting "the proposition that an employee has no more than a mere 'expectancy' prior to the maturation of his pension rights," and citing with approval case law holding that "the

community's interest" in "an employee's unvested right to a pension . . . constitutes property divisible by the court" (cleaned up)). Here, in determining whether the vested and unvested Broadcom RSUs awarded to Husband were separate or community property, the court correctly began with the presumption that if they were awarded during the marriage, they were community property. *See Brebaugh v. Deane*, 211 Ariz. 95, 99, ¶ 15 (App. 2005) (noting "the presumption that [stock options] granted during the marriage are entirely community property"); *Goodell*, 257 Ariz. at ¶ 32, 551 P.3d at 1185 (observing that RSUs are treated like stock options when dividing marital property). The court further correctly held that Husband could overcome the presumption only with clear and convincing evidence that the RSUs were his separate property. *See Barroso v. Barroso*, 1 CA-CV 17-0347 FC, 2018 WL 4018034 at *3, ¶ 17 (Ariz. App. Aug. 23, 2018) (mem. decision) (rejecting argument "that the superior court erred by characterizing [Father's] RSUs as community property"; "The RSUs were granted during the marriage, and Father did not present evidence at trial sufficient to rebut the presumption that they were community property.").

**¶36** In support of his position that the "community" presumption does not apply to unvested RSUs, Husband relies on *Goodell v. Goodell*, 257 Ariz. 536, 551 P.3d 1177 (App. 2024). In *Goodell*, the wife argued that the husband committed community waste by leaving his job before his employer-issued RSUs vested, thereby forfeiting them. *Id.* at ¶ 31, 551 P.3d at 1185. Concluding that the forfeited RSUs were community property, the trial court awarded the wife one-half of their value using "a combination" of the formulas established in *Hug* and *In re Nelson*, 177 Cal. App. 3d 150, 222 Cal. Rptr. 790 (1986). *Goodell*, 257 Ariz. at ¶ 12, 551 P.3d at 1182. On appeal, this Court reversed. *Id.* at ¶ 38, 551 P.3d at 1186. The *Goodell* court held that "the *Hug* and *Nelson* formulas . . . serv[e] different purposes," explaining that the *Hug* formula applies to stock options "granted for past or current performance" while the *Nelson* formula applies "if the options are for future performance." *Id.* at ¶ 32, 551 P.3d at 1185. The Court concluded that the trial court erred in failing to determine "whether the RSUs were intended for past performance or as a future incentive" and in fashioning "a combination" of two "mutually exclusive" formulas for dividing them. *Id.* at ¶¶ 32-33, 551 P.3d at 1185.

**¶37** Nothing in *Goodell* suggests that the "community" presumption does not apply to RSUs granted during the employee-spouse's marriage; indeed, *Goodell* does not mention the presumption at all. Moreover, as its extensive discussion of the issue shows, the superior court here was well aware of the principle that whether RSUs granted during marriage are the employee-spouse's separate property depends on the

employer's purpose in granting them. After considering Husband's testimony about his employer's purpose in granting the RSUs as well as Husband's failure to present documentary or testimonial evidence from his employer, the court acted within its discretion in finding the evidence insufficient to overcome the presumption that the RSUs were community property. *See Gutierrez*, 193 Ariz. at 347-48, ¶ 13 (noting that appellate court defers to trial court's credibility determinations and weighing of evidence). Further, the *Goodell* court's holding that the trial court erred in combining the *Hug* and *Nelson* formulas has no application here. *Goodell* is of no help to Husband.

> **2.    The Court Did Not Abuse its Discretion in Determining that Husband Failed to Meet His Burden of Overcoming the Presumption that the Broadcom RSUs Were Community Property.**

**¶38**        Husband next argues that the court erred in finding that he failed to overcome the "community" presumption because, he insists, the "overwhelming evidence" at trial established that the unvested RSUs were awarded to him "to encourage future performance."

**¶39**        For purposes of allocating the spouses' property, courts treat RSUs in the same manner as stock options. *See Barroso*, 2018 WL 4018034 at *3, ¶ 17. Stock options intended to compensate the employee-spouse for past services rendered during the marriage are community property, while stock options intended to encourage the employee-spouse's continued employment and future performance are his or her separate property. *Brebaugh*, 211 Ariz. at 98, ¶ 8. For the same reason, RSUs that are granted during marriage to reward the employee-spouse's past service are community property, while RSUs awarded to incentivize performance in the future, after termination of the marital community, are the employee-spouse's separate property. *See Goodell*, 257 Ariz. at ¶ 32, 551 P.3d at 1185.

**¶40**        Although Husband contends that the trial evidence showed that his unvested RSUs "were intended to encourage [his] future performance," the superior court did not abuse its discretion in finding to the contrary. Husband presented no documentary evidence at trial of the terms of the RSUs or the purpose for which they were awarded. Nor did he present the testimony of any representative of his employer to explain why the employer granted the RSUs. The only evidence Husband cites to indicate that the unvested Broadcom RSUs were intended to encourage future performance is his own testimony. Specifically, Husband cites the following exchanges with his counsel during direct examination:

Husband's counsel: And so are they [*i.e.*, the RSUs] given to you as like a bonus or is it some kind of incentive program, what is it?

Husband: *I imagine that they granted them to us* so that, you know, what quite often happens in the course of acquisition is that talented employees head for the exits because they want to trade certainty for uncertainty in those times. So when these were provided, I can't speak to the motivation of Broadcom (unintelligible). It would appear that they wanted to retain talented employees (unintelligible).

. . .

Husband's counsel: [C]an you explain to me why you refer to [the RSUs] that way?

Husband: Certainly. Well, because it's not -- it's not something that, you know, is a -- is part of the (Unintelligible) remuneration on it -- regular pay period, and it's -- it's more of a -- a deferred or incentive compensation to stay with the company, and they're all granted if you satisfy the terms of continued employment.

(emphasis added).

¶41　　　　Husband's testimony about what he "imagine[s]" Broadcom intended hardly constitutes competent evidence of his employer's purpose in granting the RSUs. *See Trailhead Restriction, LLC v. City of Phoenix*, 1 CA-CV 22-0735, 2023 WL 6439954 at *5, ¶ 30 (Ariz. App. Oct. 3, 2023) (mem. decision) (holding that witness's "conclusory assertions" about opposing party's "understanding of" disputed transaction, "unaccompanied by any specific facts, do not constitute admissible evidence"); *People v. Guenther*, 104 Cal.App.5th 483, 525, 324 Cal. Rptr. 3d 765, 800 (2024) ("A lay witness generally may not give an opinion about another person's state of mind[.]") (citation omitted)). Further, when asked at trial to describe the RSUs, Husband testified that he would "probably" consider them "deferred compensation." Husband's testimony on this point undermines his claim that the RSUs were awarded for future services that had yet to be rendered. *See Brebaugh*, 211 Ariz. at 99, ¶ 15 (observing that stock options are community property if "intended solely as compensation for work performed or deferred compensation").

**¶42** Husband asserts that he "received annual performance bonuses that varied based upon his own performance during the year" as well as the company's. Because his annual bonuses were intended to compensate him for his performance over the preceding year, he reasons, the RSUs must have been intended to incentivize future performance. Husband did not raise this argument at the trial court, and so he waived it. *See Pflum v. Pflum*, 135 Ariz. 304, 307 (App. 1982) ("Matters not raised below will not be considered on appeal." (citations omitted)). In any event, it is not for this Court to re-weigh the evidence. *Gutierrez*, 193 Ariz. at 347-48, ¶ 13. We affirm the court's determination that the evidence presented was insufficient to overcome the presumption that the RSUs were community property because they were granted during the marriage.

> **3.** **The Court Erred in Ordering Husband to Make an Equalization Payment to Wife of One-Half of the Value of the Vested and Unvested RSUs.**

**¶43** Finding that "the fair market value of each share" of Broadcom stock was $290.30, the court found that the marital community's interest in the Broadcom RSUs equaled 382.85 shares, and so ordered Husband to make an equalization payment to Wife of $55,571 for her one-half share ($290.30 x 382.85 = $111,141.35 ÷ 2 = $55,570.68). Husband asserts that the court erred in calculating the amount of the equalization payment. RSUs are taxed once they vest, he maintains, and the court's failure to take Husband's tax liability into account led the court to reach a "highly overinflated" value of the Broadcom RSUs.

**¶44** Wife does not dispute Husband's position on this point. On the contrary, she contends that "the trial court should have ordered" the division of the Broadcom RSUs "via QDRO, so that Wife [would] receive her half of the assets while accounting for the tax implications." In response, Husband concurs that to the extent the RSUs are community property, "a QDRO will be necessary" to divide them. In light of the parties' agreement that a QDRO is the appropriate means to divide the community interest in the RSUs, we will vacate the provision of the Decree requiring Husband to make a $55,570.68 equalization payment to Wife, and remand with instructions to order the preparation of a QDRO to divide the community's interest in the Broadcom RSUs. Dividing the RSUs in this manner will resolve any concerns about an unequal allocation of the associated tax burden. *See* Brett R. Turner, *Equitable Distribution of Property*, § 6:19 4th ed. 2024 ("Benefit[s] received under a QDRO are treated as income to the nonowning spouse who receives them and not as income to the spouse who earned the benefits." (citation omitted)).

¶45　　　In its Under Advisement Ruling, the superior court determined the value of the Broadcom RSUs using the formula set forth in *Hug*. Husband argues, on appeal, that the QDRO should be conducted using the valuation method set forth in *Nelson* instead.

¶46　　　The formula set forth in *Hug* "gives more weight to the employee's entire tenure with the employer during marriage" than the formula set forth in *Nelson*. *Brebaugh*, 211 Ariz. at 100, ¶ 20. For that reason, "the *Hug* formula . . . is most appropriate for stock options that are granted for past services" while "the *Nelson* formula is more appropriate for stock options which are intended to compensate an employee for future efforts." *Id.* at ¶¶ 20-21. Because the record supports the court's determination that Husband failed to rebut the presumption that the vested and unvested RSUs are community property, we hold that the court did not err in determining that the *Hug* formula, not the *Nelson* formula, applies to the division of the RSUs.

## C.　　Division of Employee Stock Purchase Plan Shares

¶47　　　During the marriage, Husband purchased stock through Broadcom's Employee Stock Purchase Plan ("ESPP"). In its Under Advisement Ruling, the court found that thirteen shares of stock purchased through the ESPP were community property, valued at $3,773.90. The court awarded Husband all shares purchased through the Broadcom ESPP and ordered him to make an equalization payment to Wife of one-half of their value, or $1,887.

¶48　　　Wife argues the court erred in ordering an equalization payment instead of ordering that the Broadcom ESPP be divided by QDRO. At oral argument, Husband acknowledged that the ESPP should have been divided via QDRO. We therefore vacate the portion of the Decree ordering an equalization payment of $1,887 and remand with instructions to order the preparation of a QDRO to divide the Broadcom ESPP.

## D.　　Reward Points from Customer Loyalty Programs

¶49　　　During the marriage, Husband maintained rewards accounts with American Airlines, Inc. ("American"), Hilton Hotels & Resorts ("Hilton"), and Hertz Global Holdings, Inc. ("Hertz"). The court found that these accounts constitute community property, and that the community owned 1,055,000 American rewards miles, 938,285 Hilton rewards points, and 10,840 Hertz rewards points. The parties do not dispute these determinations.

¶50        At trial, Wife testified that the miles and points in Husband's name cannot be transferred to her. She asked, instead, that she be awarded half their value, testifying that the miles and points were each "worth about 10 cents." Husband indicated uncertainty about whether the miles and points are transferrable, but agreed that Wife "is entitled to an equitable distribution of them." He offered no testimony of their value. Finding that "fairness and equity" required an "equal division" of the miles and points, the court ordered that Husband transfer half of the miles and points to Wife, with the parties sharing equally in any transfer fees or costs. In the alternative, the court held that, "[i]f a transfer . . . is not possible," Husband was to make an equalization payment to Wife representing one-half of the value of the miles and points, with each mile and point valued at five cents.

¶51        In their briefing, the parties do not challenge the court's order that Husband transfer half the miles and points to Wife if possible. Husband argues, however, that the court erred in its alternative ruling requiring an equalization payment if a transfer cannot be effected. Husband asserts that Wife offered no foundation for her estimate that each mile and point was worth ten cents, and, in any event, the court's decision to value them at five cents apiece was "arbitrary" and supported by no evidence. According to Husband, the superior court should have ordered that he "hold one half of all points in [a] constructive trust" for Wife's benefit.

¶52        In response, Wife argues that the court did not abuse its discretion in attributing a value of five cents to each point and mile. In view of the conflict between "Wife's testimony that the miles and points were worth ten cents" and Husband's failure to present "any evidence . . . regarding [their] value," Wife maintains, the court acted within its discretion in "determin[ing] that it was equitable to attribute a minimal value of five cents to the miles and points."

¶53        Because Husband did not propose at trial that he hold the miles and points in a constructive trust, he has waived that argument on appeal. *See Pflum*, 135 Ariz. at 307. We agree with Husband, however, that no evidence in the record supports the court's determination that the miles and points had a value of five cents each. *See Smith v. Smith*, 253 Ariz. 43, 45, ¶ 9 (App. 2022) ("Under the abuse of discretion standard, this court will reverse the superior court's finding when the record is devoid of competent evidence to support the decision." (cleaned up)). We therefore set aside the court's determination of the value of the miles and points and remand for a new determination of the value of the miles and points if the parties are unable to secure the transfer of one-half of the miles and points to Wife. *See Beasley v. Beasley*, 717 So.2d 208, 209 (Fla. Dist. Ct. App. 1998) (affirming trial court's order dividing airline miles equally between the parties but setting

aside the court's determination that, if "the miles could not be divided (per airline policy)," husband was to pay wife for their value at a rate of ten cents per mile; "[T]he court erred in assigning a value to the miles absent evidence to support that valuation.").

### E.     Husband's Personal Property

**¶54**         In his testimony, Husband claimed ownership of certain items of personal property, including two ladders, a concrete mixer, a wood splitter, and gas cans. When asked by his counsel whether he was asking that those items be awarded to him "if in [Wife's] possession," Husband answered, "Indeed." The Decree awards Husband each of those items, and further provides that, "if Wife has" those items "in her possession, they shall be returned to Husband."

**¶55**         Husband argues that the provision that Wife shall return these items to Husband "only under the condition that she has [them]" creates "a sort of loop-hole [*sic*]" that allows Wife to evade her obligation merely by "claim[ing] non-possession of the items." As a result, Husband contends, the Decree's award of these items of property is "essentially unenforceable." Husband asks that the Decree "be corrected" to "affirmatively" direct Wife to provide these items to Husband "regardless of the status of her possession."

**¶56**         An order allocating marital property must identify the property with sufficient specificity to determine if the order has been complied with and, if not, to permit its enforcement. *See* A.R.S. § 25-318(F) ("The decree or judgment shall specifically describe by legal description any real property affected and shall specifically describe any other property affected."); *see also Joyner v. Joyner*, 460 S.W.3d 467, 475 (Mo. App. 2015) (citations omitted) ("[T]he trial court must make a distribution of marital property that is definite and capable of enforcement."). Here, the Decree expressly awarded to Husband all of the items he identifies. The Decree is hardly "unenforceable"; Husband can seek the imposition of contempt sanctions if he can show that Wife had the items and failed to turn them over. *See* ARFLP 91. Contrary to Husband's assertion, the court had no authority to order Wife to deliver the items of personal property to Husband "regardless of the status of her possession." Wife could not properly be ordered to deliver personal property that she never had in the first place. In any event, Husband asked the superior court to require Wife to turn those items over to him "if" they were in her possession, and so cannot fault the court for ordering precisely what he requested. *See Schlecht v. Schiel*, 76 Ariz. 214, 220 (1953) ("[O]ne who deliberately leads the court to

take certain action may not upon appeal assign that action as error."). We find no error in the court's ruling.

## II. Spousal Maintenance

¶57 At trial, Wife requested an award of spousal maintenance in the amount of $5,000 per month for 20 years. Husband denied that she was entitled to any spousal maintenance at all. The court determined that Wife was entitled to spousal maintenance, finding, *inter alia*, that she lacked sufficient property or earning capacity to meet her reasonable living expenses and that she sacrificed her own career to "serv[e] as the primary care provider for the [parties'] children," allowing Husband to pursue a career that required extensive travel away from home. Determining that Husband's gross monthly income, including salary, bonus, and the value of vested RSUs, exceeded $22,000 and that Wife's most recent earnings (for the first four months of 2022) came to $2,250 per month, the court ordered Husband to pay Wife spousal maintenance in the amount of $7,000 per month for 3.5 years.

¶58 Husband challenges the spousal maintenance award. He does not dispute, on appeal, Wife's entitlement to spousal maintenance, nor does he challenge the 3.5-year duration of the award. Instead, he argues that the court abused its discretion in determining the parties' incomes and Wife's reasonable living expenses.

### A. Husband's Income

¶59 The court found that Husband's "gross monthly income" for purposes of spousal maintenance "is $22,130.14." The court calculated this figure by adding Husband's "gross monthly income from his regular salary," or $11,379; his bonus income, which it found to average $3,307.42 per month; and the income he could derive from "cash[ing] out" the vested RSUs. Husband challenges each of these three findings.

#### 1. The Court Did Not Err in Determining Husband's Monthly Salary.

¶60 Noting that the court expressly stated that it "is not able to determine with specificity Husband's net monthly income, given taxation issues," Husband contends that the court erred in using his gross monthly salary, rather than net salary, in calculating his monthly income.

¶61 But Husband himself is to blame for the court's inability to calculate his after-tax income. The standard orders issued at the outset of the case included the directive that "[i]f the case involves a claim [for]

spousal maintenance, each party's Affidavit of Financial Information must include net income information, in addition to gross income information." Despite the court's instructions, Husband's affidavit of financial information ("AFI") lists only his "[g]ross monthly salary/wages," with no net income figure.

¶62        Husband attached to his AFI copies of two pay stubs listing his "net pay." Noting that the pay stubs "reflect[] a withholding rate of 31.2%," Husband argues that the court could have used this figure to "estimate" his after-tax income. Not so; an employee's withholding rate does not necessarily reflect the employee's tax liability. *See United States v. Spencer*, 178 F.3d 1365, 1367-68 (10th Cir. 1999) ("[A]n employee's paycheck withholding is based on a myriad of factors, many of which bear no relationship to the actual amount of tax owed or the rate at which the income is taxed.").

¶63        Because Husband failed to present evidence of his net monthly salary at trial despite the court's order requiring him to do so, the court did not err in considering Husband's gross, rather than net, monthly salary when determining his income for purposes of spousal maintenance. *See Biddulph v. Biddulph*, 147 Ariz. 571, 573-74 (App. 1985) (holding party that "presented no evidence to the trial court concerning his potential tax liability . . . cannot . . . claim" on appeal that "the fault lies with the trial court").

### 2.        The Court Did Not Err in Determining Husband's Average Monthly Bonus Income.

¶64        Husband next contends that the court erred in using the annual bonus he received in 2021 to determine his monthly bonus income. The $39,659.53 bonus in 2021, he contends, was the "highest bonus [he] ever received," and using this bonus "as a baseline for future year bonuses was improper."

¶65        As Wife correctly asserts, however, in determining Husband's income from bonuses, the trial court considered not only Husband's $39,659.53 bonus in the year 2021, but the $34,835 bonus he received in 2020 as well. Further, the court noted Husband's failure to present evidence of the amount of his bonus in 2019. Because the amount of his bonus in 2019 was "peculiarly within his knowledge," Husband should have presented evidence on that point if he wanted the court to consider it. *See Gutierrez*, 193 Ariz. at 350, ¶ 27 (noting that Husband failed to offer evidence of his expenses, and so "cannot now complain that the trial court abused its discretion in failing to consider them" in determining the amount of

spousal maintenance). The court did not abuse its discretion in determining Husband's bonus income based on the evidence presented. And if Husband's purported fear of a future decrease in his bonus income materializes, Husband will be free to seek a modification of the amount of spousal maintenance at that time. *See Chaney v. Chaney*, 145 Ariz. 23, 27 (App. 1985) ("[C]ourts will not ordinarily look very far into the future to discover a probable decrease in income, but rather will delay consideration of the question until it is presented by an appropriate motion after the change has occurred.").

### 3. The Court Engaged in Impermissible Double-Counting When Determining the Income Husband Could Generate from the Sale of Vested RSUs.

**¶66** Finally, Husband argues that the court erred in considering income that Husband could receive from selling vested RSUs in determining his income.

**¶67** This Court has long held that because stock options are a form of compensation, vested stock options are properly considered in determining a parent's income for purposes of calculating child support. *See In re Marriage of Robinson and Thiel*, 201 Ariz. 328, 330, 332, ¶¶ 1, 9 (App. 2001). RSUs, too, are a form of compensation, *see Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1142 (D. Ariz. 2016), and so RSUs, once vested, are properly treated as income for purposes of determining support awards. *See In re E.J.S.*, 483 P.3d 110, 115, ¶ 24 (Wash. App. 2021) (holding that parent's vested RSUs "count as income for child support purposes whether or not . . . liquidated").

**¶68** Husband's contention that he "should not be forced to liquidate" his vested RSUs to pay spousal maintenance is contrary to the well-established principle that spouses and parents cannot voluntarily defer receipt of otherwise available income as a means of reducing the amount of their support obligations. *See MacMillan v. Schwartz*, 226 Ariz. 584, 589-90, ¶ 20-21 (App. 2011) (holding that trial court did not abuse its discretion in treating payments by employer into deferred compensation plan as employee's income for spousal maintenance purposes); *see also Little v. Little*, 193 Ariz. 518, 521, ¶ 6 (1999) (noting that, when determining child support, court may impute income to parent "if the parent's earnings are reduced voluntarily and not for reasonable cause"). And Husband's assertion that the value of his RSUs is simply "theoretical" until "the RSUs are vested" ignores the fact that the court considered, as income, only the RSUs that were vested or would vest within the next year. *Cf. In re Marriage of Rowe*, 117 Ariz. 474, 476 (1978) (holding that court's finding that

unemployed spouse "would be employable within three years" did not justify modification of spousal maintenance award and noting that "what may occur three years in the future" was "speculation").

¶69        We agree with Husband, however, that the court engaged in impermissible "double-counting" when considering the proceeds from the sale of vested RSUs in determining Husband's income. In attributing to Husband the proceeds that could be realized from sale of RSUs that were already vested or would vest within the next year, the court overlooked the fact that it already awarded half of the value of those RSUs to Wife. Because the court ordered Husband to make an equalization payment to Wife equal to one-half of the value of all of the RSUs, the court should have treated only one-half of the vested and soon-to-be-vested RSUs as assets available to Husband for the payment of spousal maintenance. By attributing to Husband income from the potential sale of all of the vested and soon-to-be-vested RSUs even though the court awarded half of them to Wife, the court's calculation overstated Husband's available income from the sale of vested RSUs.

¶70        We hold that, by including income Husband could derive from the sale of RSUs without accounting for its award to Wife of one-half of the RSUs, the court erred in determining Husband's income for the purposes of spousal maintenance. We therefore remand for a new determination of Husband's income.

¶71        Although the court did not err in determining Husband's monthly salary and bonus income, *see supra* ¶¶ 60-65, the court is not bound by those findings when determining Husband's current income for purposes of redetermining spousal maintenance. Instead, when redetermining spousal maintenance, the court may consider not only the income Husband could earn from the sale of his share of the vested and soon-to-be vested RSUs, but any additional evidence the parties may present of Husband's current monthly salary and bonus income.

### B.        Wife's Income

¶72        In his reply brief, Husband argues that the court erred in attributing "minimal" income to Wife, asking this Court to "judicially notice" that "fast-food restaurants and similar employers" offer "starting salaries" that exceed the amount the court attributed to Wife.

¶73        Because Husband waited until his reply brief to offer a meaningful challenge to the court's determination of Wife's income for purposes of spousal maintenance, Husband has waived this claim. *Polanco*

*v. Indus. Comm'n of Ariz.*, 214 Ariz. 489, 491, ¶ 6 n. 2 (App. 2007) (holding that argument "mention[ed] . . . in passing" with "no relevant supporting authority" was waived as insufficiently developed (citations omitted)); *In re Marriage of Pownall*, 197 Ariz. 577, 583, ¶ 25 n. 5 (App. 2000) ("Arguments raised for the first time in a reply brief are deemed waived." (citation omitted)). As indicated in ¶ 71, *supra*, however, when redetermining spousal maintenance, the court may consider additional evidence of Wife's current income and earning capacity.

### C. Wife's Reasonable Living Expenses

**¶74** Wife claimed living expenses of $11,299 per month. The court found that her reasonable monthly living expenses were $10,612. Husband challenges the court's determination, complaining that the figure the court found to be reasonable was "excessive and abnormal." In support of his position, Husband notes, first, that "the $10,612 figure" is "nearly a thousand dollars more than Husband's monthly expenses."

**¶75** Husband cites no authority, and we are aware of none, for the proposition that the monthly living expenses of the recipient of spousal maintenance are necessarily unreasonable if they exceed those of the paying spouse. The court found Wife's monthly expenses to be reasonable based on Wife's testimony and her affidavit of financial information, and we decline to re-weigh the evidence or substitute our own judgment on appeal. *See Kelsey v. Kelsey*, 186 Ariz. 49, 51 (App. 1996).

**¶76** Although Husband complains in general terms about Wife's purportedly exorbitant living expenses, the only specific expense he identifies as excessive is her reported "pet expenses" of $1,816 per month. Acknowledging that she has two dogs and a cat, Wife testified that the bulk of her pet expenditures go toward the cost of boarding and caring for three horses. Wife further testified that two of the three horses she keeps belong to the parties' daughter and that during the marriage the parties always kept horses (as many as six at one time). Husband did not dispute Wife's testimony on these points. Because the undisputed evidence shows that the parties kept multiple horses throughout the marriage, we find no abuse of discretion in the court's determination that Wife reasonably incurs the expense of keeping three horses. *See Helland v. Helland*, 236 Ariz. 197, 203, ¶ 28 (App. 2014) ("An order for payment of spousal maintenance should promote a transition to financial independence for the receiving spouse *while allowing a reasonable approximation of the standard of living established during the marriage*." (emphasis added) (cleaned up)).

¶77        In the absence of any other specific challenge to Wife's claimed living expenses, we find that the court did not err in determining Wife's reasonable living expenses.

## III.    Husband's *Bobrow* Claim

¶78        A party who uses separate property to service community debt or maintain community assets after termination of the marital community is generally entitled to reimbursement for those expenditures, unless the other spouse establishes that the expenditures were intended to be a gift to the community. *Bobrow v. Bobrow*, 241 Ariz. 592, 596-97, ¶¶ 19-20 (App. 2017). In reliance on *Bobrow*, Husband asserted a claim at trial for reimbursement for the monthly mortgage payments, property taxes, utility bills, maintenance costs, and related expenses that he paid for the community's rental properties. When asked at trial if he disclosed "receipts" for "maintenance" such as "plumbing work . . . or air conditioner work" before trial, Husband replied, "I have records of it. I didn't know I had to disclose it." When he offered evidence of expenses he purportedly paid for the rental properties, Wife moved to preclude it. The court granted Wife's motion in part and entered sanctions limiting the scope of Husband's testimony concerning expenses he paid for the rental properties. The court ruled that it would allow Husband to present evidence of his payment of the mortgages, property taxes, and property management fees associated with the rental properties, reasoning that Wife and Husband owned the rental properties jointly and so both "should have access to that type of information." The court declined, however, "to permit [Husband] to testify or present other evidence in relation to utilities, repairs, [and] maintenance" because he failed to disclose receipts or other documentation of the cost of "repairs or upkeep for the various units."

¶79        In the end, the court found that Husband failed to establish that he used any separate funds to pay community expenses, finding, instead, that Husband used community funds to pay community expenses. The court explained that the evidence showed that Husband "elected to continue to have" his post-termination paychecks deposited into the same account with Desert Financial Credit Union ("DFCU") into which he deposited community property in the form of rent payments from tenants of the community's rental properties. Finding it "impossible to determine what expenses were paid" with Husband's post-termination salary, the court held that the commingling of separate and community income "transmuted" Husband's post-termination salary deposits into community property. "If Husband wished" to establish "that some portion of the commingled funds were his sole and separate property," the court held, "he

had to demonstrate this . . . by clear and convincing evidence. He has not done so."

**¶80**        Husband does not dispute the court's finding that he commingled separate and community funds by depositing post-service paychecks and community rent checks into a single account. Husband asserts, however, that he could have traced the disposition of the funds deposited into this account but for the court's order precluding evidence as a sanction for nondisclosure. Identifying certain trial exhibits that "were not admitted due to the sanctions," Husband asserts that but for the court's preclusion order, he could have "offered much more information" to enable the court "to accurately determine" which funds were his separate property for purposes of establishing his *Bobrow* claim. Alleging that the court abused its discretion in imposing the "crushing" sanction of preclusion, Husband requests that we "remand the *Bobrow* reimbursement issue to the trial court for further determination." In response, Wife argues that "the trial court appropriately sanctioned [Husband] by limiting his reimbursement claims at trial to certain expenses paid for the parties' real properties."

**¶81**        We agree with Wife. ARFLP 65(a)(2)(A) allows a party to request sanctions for the failure to disclose information. *See* ARFLP 65. Appropriate sanctions include "prohibiting the disobedient party from supporting or opposing designated arguments, or from introducing designated matters in evidence." ARFLP 65(b)(1)(B). The court had previously granted Wife's motion to compel disclosure of documentation of these expenses. Although Husband asserts, without explanation, that he "believed he was compliant" with his disclosure obligations, he points to nothing in the record suggesting that he timely disclosed the receipts and other documents whose preclusion he now challenges. In the absence of any evidence in the record to suggest that the court erred in concluding that Husband failed to comply with his disclosure obligations, we find no error in the court's ruling precluding him from offering evidence of the undisclosed maintenance expenses he purportedly incurred in maintaining the rental properties. And the court did not err in determining, based on the evidence admitted, that Husband failed to establish that community expenses were paid using separate funds he deposited into the DFCU account.

## IV. Attorney Fees

### A. The Court Did Not Abuse Its Discretion in Awarding Wife 40% of Her Reasonable Attorney Fees Under A.R.S. § 25-324(A).

¶82　　In considering an award of attorney fees, the court noted that "Husband's gross monthly income in 2021 was $22,130.14" and that "Wife had no gross income after paying business expenses." The court found that the parties' assets were comparable after taking into account the disposition of marital property and the award of spousal maintenance to Wife. The court further found that both parties had taken unreasonable positions during the proceedings. Wife was unreasonable, the court found, in requesting an award of spousal maintenance for 20 years and in seeking an excessive share of the RSUs granted to Husband. Husband was unreasonable, the court found, in failing to comply with his discovery obligations and with the temporary orders, resulting in two contempt citations. We review an award of attorney fees for an abuse of discretion, *Myrick v. Maloney*, 235 Ariz. 491, 494, ¶ 6 (App. 2014) (citation omitted), and will not reverse the award "if there is any reasonable basis for it." *In re Marriage of Gibbs*, 227 Ariz. 403, 410, ¶ 20 (App. 2011) (cleaned up).

¶83　　Husband contends that the court abused its discretion in ordering him to pay 40 percent of Wife's attorney fees even though "the trial court found Wife's position to be unreasonable." Given that the court found both parties to be unreasonable, Husband argues "[i]t is well within the authority of a trial court to not award attorney's fees" to either party. Husband concludes by urging that the issue be remanded "for further determination in light of the fact that the trial court determined both parties to be unreasonable."

¶84　　Section 25-324(A) gives a court discretion to award attorney fees to either party after consideration of "the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings." A.R.S. § 25-324(A). As Wife correctly argues, A.R.S. § 25-324(A) does not preclude an award of attorney fees to one party merely because the court found both parties to be unreasonable. *See In re Matter of Brown v. Smith*, 1 CA-CV 24-0164 FC, 2024 WL 4513029, at *2, ¶ 9 (Ariz. App. Oct. 17, 2024) (mem. decision) (holding that the trial court was within its discretion to award attorney fees to one party when both parties were found to have acted unreasonably). Here, the court considered both the financial resources of the parties as well as the reasonableness of their respective positions. Therefore, the court did not abuse its discretion by awarding Wife a portion of her attorney fees. *See Magee v. Magee*, 206 Ariz.

589, 591, ¶8 n.1 (App. 2004) (noting that the "reasonableness of the positions" provision "is separate from the 'financial resources' provision, and an applicant need not show both . . . in order to qualify for consideration for an award").

### B.    We Decline to Award Attorney Fees on Appeal.

¶85    Husband and Wife both request attorney fees and costs on appeal, citing ARCAP 21 and A.R.S. § 25-324. In our discretion, we deny each party's request for attorney fees. Wife is awarded costs on appeal, pending her compliance with Arizona Rule of Civil Appellate Procedure 21.

### CONCLUSION

¶86    For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

